**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

JEFFREY D. CRANDALL; MICHAEL
MCDONNELL,
*Defendants-Appellants.*

Nos. 06-50592
06-50593

D.C. Nos.
CR-04-00309-
DOC-7
CR-04-00309-
DOC-4

OPINION

Appeal from the United States District Court
for the Central District of California
David O. Carter, District Judge, Presiding

Argued and Submitted
January 10, 2008—Pasadena, California

Filed May 13, 2008

Before: Jerome Farris and Milan D. Smith, Jr.,
Circuit Judges, and H. Russel Holland,* District Judge.

Opinion by Judge Holland

---

*The Honorable H. Russel Holland, Senior United States District Judge for the District of Alaska, sitting by designation.

5373

---

**COUNSEL**

Jerald L. Brainin Esq, Los Angeles California; H. Dean Steward Esq., for the defendants-appellants.

Andrew Stolper Esq., Assistant United States Attorney, Santa Ana, California, for the plaintiff-appellee.

---

**OPINION**

HOLLAND, District Judge:

Jeffrey Dean Crandall and Michael McDonnell (collectively, "Defendants") appeal their convictions and sentences for mail, wire, and honest services fraud, in violation of 18 U.S.C. §§ 1341, 1343, and 1346.[1] Defendants challenge their convictions based on the district court's refusal to give their proposed jury instruction on "intent to defraud." They appeal their sentences arguing that the district court erred in relying on Application Note 2(F)(v)(III) to U.S.S.G. § 2B1.1[2] to calculate loss. McDonnell also argues that his sentence was unreasonable because of the disparity between his sentence and that of a codefendant's. Finally, McDonnell argues that his restitution order was illegal. We have jurisdiction to

---

[1]McDonnell was also convicted of bank fraud, in violation of 18 U.S.C. § 1344.

[2]The district court employed and we refer to the Sentencing Guidelines effective November 1, 2001.

review the convictions under 28 U.S.C. § 1291 and the sentences under 18 U.S.C. § 3742(a)(2). We affirm Defendants' convictions but vacate and remand as to their sentences and as to McDonnell's restitution order.

I

The charges against Defendants arose out of a fraudulent scheme to convert apartment buildings to condominiums in Huntington Beach, California between 1998 and 2003. The scheme was hatched by codefendant Philip Benson, a real estate broker. Benson solicited people who owned or were willing to purchase four-plex apartment buildings. The apartment buildings were then fraudulently converted to stock cooperatives through the creation of false back-dated documents.

To legally convert an apartment building to individual condominiums, the City of Huntington Beach required a conditional use permit. Obtaining a conditional use permit was a difficult and expensive process. There was an exception, however, for stock cooperatives. An apartment building held as a stock cooperative could be converted to individual condominiums without first obtaining a conditional use permit. The false back-dated stock cooperative documents were employed by Defendants to avoid having to obtain conditional use permits from the City.

Once the fraudulent stock cooperatives were created, the buildings were then converted into individual condominiums. This conversion process involved the creation of additional false documents, including lease terminations and grant deeds. After the buildings were converted into condominiums, codefendant Harvey DuBose, who worked for Stewart Title Company, prepared title insurance policies so the building owners could sell the individual condominiums to unsuspecting buyers. The building owners paid Benson a "conversion fee" for each building that was converted and also paid

DuBose individually for his role in providing the title insurance.

Defendants were purchasers of apartment buildings which were fraudulently converted to individual condominiums. Crandall bought two four-unit apartment buildings and subsequently sold seven of his converted "condominiums" for a total of $1,938,400. Crandall retained the eighth "condominium" as his personal residence.

McDonnell bought a total of five four-unit apartment buildings. McDonnell could not obtain sufficient financing to purchase all of the apartment buildings, so he recruited former colleagues to act as his straw buyers. McDonnell sold all of his converted "condominiums" for a total of $4,261,800.

In addition to using straw buyers for his own properties, McDonnell agreed to act as the straw buyer of an apartment building for Pamela Julien Houchen, who, at the time, was the mayor of Huntington Beach and a member of the City Council. Houchen was prohibited from buying the apartment building in her name because it was located in a redevelopment zone overseen by city council members. After allegations of the fraud emerged, McDonnell retained an attorney to write a demand letter to Houchen claiming that he was entitled to the proceeds of the sales of the property in question, but McDonnell failed to tell his attorney that he had agreed to be a straw buyer for Houchen.

At trial, the core of Defendants' defense was the contention that they did not know that the conversion documents were false when they signed them, and thus they lacked the intent to defraud. Crandall testified that he only glanced at the conversion documents that Benson gave him before signing them, and McDonnell testified that he signed the conversion documents where Benson told him to sign, without reading them. Although the parties stipulated to the use of the Ninth Circuit Model Jury Instructions for wire and mail fraud, the parties

did not agree as to the jury instruction defining the "intent to defraud" element. The district court gave the Ninth Circuit Model Instruction on "intent to defraud," rather than Defendants' proposed "intent to defraud" instruction.

The jury ultimately convicted Crandall of 9 counts of mail, wire, and honest services fraud; and McDonnell was convicted of 30 counts of mail, wire, bank, and honest services fraud. At the sentencing hearing, Crandall argued that the actual loss that resulted from his fraudulent scheme was $63,000, the amount of loss incurred by Stewart Title Company in connection with the sale of his "condominiums." Crandall argued that there was no economic loss suffered by the buyers of the fraudulently converted "condominiums" because the units were worth more at the time of trial than when they had been purchased from Crandall. McDonnell argued that the actual loss that resulted from his fraudulent scheme was $361,000, the amount of loss incurred by Stewart Title Company in connection with the sale of his "condominiums." McDonnell argued that there was no other economic loss because he incurred a loss of $149,109.89 from the sale of his "condominiums." The district court rejected Defendants' arguments and calculated the actual loss as the total sales price of the "condominiums" each of them had sold. This resulted in Crandall's base offense level being increased by 16 levels and McDonnell's by 18. Based on a total offense level of 22, the district court calculated the advisory Sentencing Guidelines range for Crandall to be 41 to 51 months. Based on a total offense level of 28, the district court calculated the advisory Sentencing Guidelines range for McDonnell to be 78 to 97 months. After considering relevant 18 U.S.C. § 3553(a) sentencing factors, the district court imposed sentences that were at the bottom of the guideline ranges, sentencing Crandall to 41 months and McDonnell to 78 months. The district court also ordered that McDonnell pay $361,000 in restitution.

II

Defendants argue that their convictions must be reversed because the district court erred in declining to give their proposed "intent to defraud"[3] jury instruction. Defendants' requested "intent to defraud" instruction was based on *Arthur Andersen LLP v. United States*, 544 U.S. 696 (2005), an obstruction of justice case, and read:

> An intent to defraud is an intent to deceive or cheat. You can find an intent to deceive or cheat only if, after reviewing all the evidence, you are convinced beyond a reasonable doubt that the defendant knowingly and consciously engaged in criminal wrongdoing.

The district court declined to give this proposed instruction because the mail and wire fraud statutes do not require "consciousness of wrongdoing" and the Court in *Arthur Andersen* did not indicate that its holding was to apply to other criminal statutes.

[1] "[A] defendant is entitled to have the judge instruct the jury on his theory of defense, provided that it is supported by law and has some foundation in the evidence." *United States v. Fejes*, 232 F.3d 696, 702 (9th Cir. 2000) (quotation omitted). We review de novo whether a proposed instruction is supported by law. *United States v. Garcia-Cruz*, 978 F.2d 537, 540 (9th Cir. 1992).

[2] Defendants' proposed "intent to defraud" jury instruction was not supported by law. *Arthur Andersen* involved an obstruction of justice charge under 18 U.S.C. §§ 1512(b)(2)(A) and (B) and the meaning of "knowingly . . .

---

[3]To obtain a conviction on mail and wire fraud, the government must prove that the defendant had a specific intent to defraud. *See United States v. Manion*, 339 F.3d 1153, 1156 (9th Cir. 2003).

corruptly persuade" under that statute. 544 U.S. at 698. *Arthur Andersen* did not involve either the mail or wire fraud statute and there is no indication that the Court intended its holding as to the *mens rea* requirement for obstruction of justice to extend to other federal statutes. *See United States v. Gay*, 967 F.2d 322, 327 (9th Cir. 1992) (declining to apply a Supreme Court tax decision to a mail and wire fraud case). Moreover, the "intent to defraud" instruction that was given[4] adequately covered the defense theory of lack of intent. *See United States v. Mason*, 902 F.2d 1434, 1438 (9th Cir. 1990) ("[I]t is not reversible error to reject a defendant's proposed instruction on his theory of the case if other instructions, in their entirety, adequately cover that defense theory.").

## III

**[3]** Defendants argue that their sentences must be vacated because the district court erred in relying on Application Note 2(F)(v)(III) to U.S.S.G. § 2B1.1 to calculate the loss caused by the fraud. "We review the district court's interpretation of the Sentencing Guidelines de novo." *United States v. Garcia*, 497 F.3d 964, 969 (9th Cir. 2007); *see also United States v. Grissom*, No. 06-10688, 2008 WL 1722813, at *4 (9th Cir. April 15, 2008). We review the district court's application of the Sentencing Guidelines to the facts for abuse of discretion. *United States v. Gonzales*, 506 F.3d 940, 943 (9th Cir. 2007) (en banc). Whether the district court's reliance on Application Note 2(F)(v)(iii) involves an interpretation or an application of the guidelines is irrelevant because the result is the same under either standard.

Under U.S.S.G. § 2B1.1(b)(1), if a crime involving fraud resulted in a loss of more than $5000, the base offense level is increased depending on the amount of actual or intended loss, whichever is greater. *See* U.S.S.G. § 2B1.1 cmt. n.2(A).

---

[4]The Ninth Circuit Model Instruction reads: "An intent to defraud is an intent to deceive or cheat."

"The guidelines do not present a single universal method for loss calculation under § 2B1.1—nor could they, given the fact-intensive and individualized nature of the inquiry." *United States v. Zolp*, 479 F.3d 715, 718 (9th Cir. 2007). For that reason, "§ 2B1.1 is not to be applied mechanically in valuing loss" and sentencing courts are instructed to " 'take a realistic, economic approach to determine what losses the defendant truly caused or intended to cause, rather than the use of some approach which does not reflect the monetary loss.' " *United States v. Stoddard*, 150 F.3d 1140, 1145-46 (9th Cir. 1998) (quoting *United States v. Allison*, 86 F.3d 940, 943 (9th Cir. 1996)).

The guidelines do provide some "special rules" to assist sentencing courts in calculating the amount of loss in particular cases. To calculate the amount of loss, the district court relied on the "special rule" in Application Note 2(F)(v)(III), which provides, in pertinent part:

> In a case involving a scheme in which . . . (III) goods for which regulatory approval by a government agency was required but not obtained, or was obtained by fraud, loss shall include the amount paid for the property, services or goods transferred, rendered, or misrepresented, with no credit provided for the value of those items or services.

The district court, based on the recommendation of the probation office, found that subpart (III) was applicable because in order to convert an apartment building into individual condominiums, an owner was required to obtain governmental approval through the conditional use permit process, but Defendants had failed to obtain the proper approval.

**[4]** The district court erred in relying on Application Note 2(F)(v)(III) to calculate loss. This Application Note is concerned with schemes involving "goods" which are subject to regulatory approval by the government. "Goods" are com-

monly defined as "[t]angible or movable personal property other than money[.]"[5] The fraud in this case involved real property, not personal property. Although there is one reference in the note to "property," the focus of subpart (III) is on "goods." In short, the plain language of Application Note 2(F)(v)(III) indicates that this subpart applies to cases involving goods, not cases involving real property.[6]

Moreover, the use of Application Note 2(F)(v)(III) was not a realistic, economic approach to calculating the loss caused by the fraud. The converted "condominiums" that were purchased from Defendants were not completely worthless at the time of purchase, even though the buyers did not get that for which they bargained. The buyers bargained for condominiums and they got apartments which had not been legally converted. Nevertheless, the apartments had significant value because the buyers could live in their units or they could rent their units out as apartments.[7] Without Sentencing Commission direction or policy, it is improbable from a realistic, economic perspective that the "condominiums" had no value to the victims of the fraud, even though the units may have been difficult or impossible to resell.

While it is clear that the district court erred in relying on Application Note 2(F)(v)(III) to calculate loss, it is not immediately apparent how the district court should have calculated the loss suffered by the victims of the fraud. Defendants suggest that Application Note 2(E)(i) or (ii) could apply here, but

---

[5]*Black's Law Dictionary* 714 (8th ed. 1999).

[6]The only two published cases that make reference to Application Note 2(F)(v) both involve consumer goods, not real estate. *See United States v. Canova*, 412 F.3d 331 (2d Cir. 2005) (pacemakers); *United States v. Milstein*, 401 F.3d 53 (2d Cir. 2005) (misbranded drugs).

[7]We are mindful that at least one of the McDonnell units was not habitable when purchased due to construction problems that arose during the "conversion" process; but, from the record that is before the court, it appears that most of the units sold by Defendants were habitable at the time of purchase.

neither of these fit this case. Application Note 2(E)(i) pro-
vides that "[l]oss shall be reduced by . . . the fair market value
of the property returned," but Defendants did not "return" any
property to the victims. Application Note 2(E)(ii) provides
that

> [l]oss shall be reduced . . . [i]n a case involving col-
> lateral pledged or otherwise provided by the defen-
> dant, [by] the amount the victim has recovered at the
> time of sentencing from disposition of the collateral,
> or if the collateral has not been disposed of by that
> time, [by] the fair market value of the collateral at
> the time of sentencing.

But, Defendants did not pledge or otherwise provide collateral
to any of the victims.

[5] In calculating loss for sentencing purposes, our focus is
on the loss inflicted upon the victims, who are, in this case,
the buyers of the fraudulently converted "condominiums." *See
United States v. Harper*, 32 F.3d 1387, 1392 (9th Cir. 1994).
As noted above, "loss" can involve both actual and intended
loss, but here we are dealing only with actual loss. Defen-
dants' fraudulent scheme was intended to enhance the market-
ability and value of the apartments which were sold.
Defendants did not intend that the buyers would suffer any
loss. Hence, the loss, if any, suffered by the buyers must be
measured in terms of "actual loss," not intended loss.

"Actual loss" is defined as "the reasonably foreseeable
pecuniary harm that resulted from the offense." U.S.S.G.
§ 2B1.1 cmt. n.2(A)(i). "Pecuniary harm" is "harm that is
monetary or that otherwise is readily measured in money" and
"does not include emotional distress, harm to reputation, or
other non-economic harm." *Id.* cmt. n.2(A)(iii). "Reasonably
foreseeable pecuniary harm" is "pecuniary harm that the
defendant knew, or under the circumstances, reasonably
should have known, was a potential result of the offense." *Id.*

cmt. n.2(A)(iv). In calculating actual harm, "[t]he court need only make a reasonable estimate of the loss." *Id.* cmt. n.2(C). The guidelines offer the following general instructions for estimation of loss:

> The estimate of loss shall be based on available information, taking into account, as appropriate and practicable under the circumstances, factors such as the following:
>
> > (i) The fair market value of the property unlawfully taken or destroyed; or, if the fair market value is impracticable to determine or inadequately measures the harm, the cost to the victim of replacing that property.
> >
> > (ii) The cost of repairs to damaged property.
> >
> > (iii) The approximate number of victims multiplied by the average loss to each victim.
> >
> > (iv) More general factors, such as the scope and duration of the offense and revenues generated by similar operations.

*Id.* This Application Note suggests several different methods that the district court might employ to estimate loss from the real estate fraud committed by Defendants.

First, the district court could use fair market value appraisals of the property involved in the fraudulent sales to estimate loss (what the victims paid less the fair market value of what they received at the time of the sale[8]). However, the use of fair

---

[8]Although U.S.S.G. § 2B1.1 is silent as to the appropriate valuation date for a loss determination, in this case, the actual loss to the victims at the

market value appraisals has some drawbacks because obtaining appraisals is expensive and may cause unacceptable delay in sentencing. Moreover, on the facts of this case, the appraisal approach may not fairly reflect economic reality—the actual monetary loss to the victims. Whereas an illegally converted condominium may be unmarketable and therefore have little or no value in the market, that "condominium" may have significant, actual economic value to the buyer, if the buyer purchased the unit for purposes of occupancy and not resale.

District courts can also estimate loss by considering the "cost of repairs to damaged property." U.S.S.G. § 2B1.1 cmt. n.2(C)(ii). Here, although the real property was not physically "damaged," the buyers faced thousands of dollars in fees in order to bring their units into compliance. These fees would be analogous to paying to repair damaged property. Thus, a reasonable estimate of loss may be the cost that the victims of the fraud would have had to pay to make their "condominiums" legal, but for the fortuitous settlement between Stewart Title Company and the City of Huntington Beach. This is a realistic, economic estimate of loss inasmuch as it reflects what it would have cost the victims to become whole and reflects the value of what the victims actually lost, namely the ability to sell the property if they chose.

As a third alternative, the district court might be of the view that the loss from the fraud cannot be reasonably determined,

_____

time of the fraud, as opposed to the time of trial or sentencing, best captures Defendants' culpability. The volatile nature of the real estate market is wholly independent of Defendants' actions and, for sentencing purposes, they should not benefit from the ultimate conversion of the units into condominiums. *See United States v. Gordon*, 393 F.3d 1044, 1052 n.6 (9th Cir. 2004) ("there is little logic in increasing or decreasing a defendant's sentence as a result of unpredictable fluctuating values for misappropriated items in a punitive context"); *United States v. Bae*, 250 F.3d 774, 776 (D.C. Cir. 2001) ("the loss associated with their fraudulent procurement is equal to the value of the goods at the time of the offense").

given the nature of the property involved in the fraud. Should that be the case, the district court could rely on Application Note 2(B) to U.S.S.G. § 2B1.1 to calculate the loss for sentencing purposes. Application Note 2(B) provides that "[t]he court shall use the gain that resulted from the offense as an alternative measure of loss only if there is a loss but it reasonably cannot be determined." Here, Defendants purchased four-plexes and then resold them as though the individual units were condominiums. Defendants' "gain" might be valued by comparing Defendants' cost of purchasing the apartment buildings to the gross sale prices of the buildings to the victims.

[6] Depending on the nature of the fraudulent scheme involved, there may be still other approaches a district court could properly employ to determine loss for purposes of sentencing in a fraud case involving real property. For example, if the fraudulently sold property has been resold by the victim, a comparison of the price on resale to the price paid to the defendant may be a realistic measure of the economic loss to that particular victim. It is also possible that tax assessor valuations might be useful in some cases in estimating the loss suffered by a victim of the fraud. But, whatever approach the district court takes, it must take a realistic, economic approach that reflects the monetary loss to the victims of the fraud. Here, the district court, by relying on Application Note 2(F)(v)(III) to calculate loss, failed to take such an approach. As a result, the district court erred in calculating the applicable guidelines ranges for Defendants. Because this error was not harmless, Defendants' sentences are vacated,[9] and we remand for resentencing.

---

[9]Because we vacate Defendants' sentences on this ground, we need not consider McDonnell's other sentencing argument, in which Crandall sought leave to join. McDonnell argued that his sentence was unreasonable because it was disproportionately longer than that of codefendant Howard Richey. Had we considered this argument, we would have rejected it because "[d]isparity in sentences between codefendants is not

IV

McDonnell argues that his restitution order of $361,000 was illegal[10] because it appears to be based on the loss to Stewart Title Company ("Stewart Title") rather than on the loss to the persons who purchased the fraudulently converted "condominiums." At sentencing, the district court made it clear that it did not perceive Stewart Title as a victim and that Stewart Title was not to receive any restitution. However, the amount of restitution that the district court ordered was calculated by the probation office, and the only "victim" identified by the probation officer in McDonnell's presentence report was Stewart Title.

[7] Loss for purposes of evaluating the seriousness of a fraud under the Sentencing Guidelines and loss for purposes of restitution are, on the facts of this case, potentially quite different. The purpose of restitution "is to make the victims whole" while "the Sentencing Guidelines serve a punitive purpose[.]" *Gordon*, 393 F.3d at 1052 n.6. "[T]he amount of restitution . . . is limited to the victim's *actual losses*." *United States v. Bussell*, 504 F.3d 956, 964 (9th Cir. 2007) (emphasis in the original).

[8] As a result of Stewart Title's settlement with the City of Huntington Beach, the "condominium" buyers may ultimately have gotten the legal condominiums for which they

---

sufficient ground to attack a proper guidelines sentence." *United States v. Whitecotton,* 142 F.3d 1194, 1200 (9th Cir. 1998). In addition, the differences between Defendants' sentences and that of Richey were warranted, given that the district court found that Crandall perjured himself during the trial and McDonnell sold many more units than Richey for approximately twice as much money, was convicted on charges relating to his involvement in the Houchen scheme and for bank fraud, and had tried to "shake down" Houchen when the fraudulent scheme came to light.

[10]Crandall withdrew his argument that his restitution order of $63,000 was illegal.

bargained. The buyers may have suffered no loss for purposes of restitution. McDonnell has not briefed nor argued the issue of whether the district court erred in concluding that Stewart Title was not a victim of the fraudulent scheme in which its dishonest employee joined. We need not decide this issue because the government concedes that the basis for the district court's restitution order was not adequately set forth. Accordingly, we vacate McDonnell's restitution order and remand to the district court to reassess restitution as to McDonnell. We leave it to the district court to reconsider whether Stewart Title was a second-tier victim for purposes of restitution.

V

In conclusion, Defendants' convictions are affirmed because their proposed "intent to defraud" jury instruction was not supported by law and because the jury instructions that were given adequately covered their lack of intent defense theory. Because the district court improperly relied on Application Note 2(F)(v)(III) to calculate the loss that resulted from the fraud, Defendants' sentences are vacated. McDonnell's restitution order is also vacated because it is unclear whether the restitution amount is based on what was actually lost by the victims of the fraud. This matter is remanded for resentencing and for reassessment of the amount of McDonnell's restitution.

**Convictions AFFIRMED; sentences and McDonnell restitution order VACATED; REMANDED for resentencing**.