**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
            *Plaintiff-Appellee,*

v.

CHARLES NOLON BUSH,
            *Defendant-Appellant.*

No. 09-30131

D.C. No.
3:06-cr-05504-
RBL-1

OPINION

Appeal from the United States District Court
for the Western District of Washington
Ronald B. Leighton, District Judge, Presiding

Argued and Submitted
October 4, 2010—Seattle, Washington

Filed December 3, 2010

Before: Sidney R. Thomas and Milan D. Smith, Jr.,
Circuit Judges, and David A. Ezra, District Judge.*

Opinion by Judge Milan D. Smith, Jr.

*The Honorable David A. Ezra, United States District Judge for the District of Hawaii, sitting by designation.

19195

## COUNSEL

Gregory Charles Link, Esq., Washington Appellate Project, Seattle, Washington, for defendant-appellant Charles Nolon Bush.

Helen J. Brunner, Esq., Assistant United States Attorney; Arlen A. Storm, Esq., Assistant United States Attorney, Western District of Washington, Seattle, Washington, for the appellee United States of America.

## OPINION

M. SMITH, Circuit Judge:

Defendant-Appellant Charles Nolon Bush appeals his conviction on twenty-seven of thirty-two counts charged in the Indictment. A jury convicted Bush of one count of securities fraud in violation 15 U.S.C. §§ 78j(b) and 78ff(a), eight counts of wire fraud in violation of 18 U.S.C. § 1343, three counts of mail fraud in violation of 18 U.S.C. § 1341, and fifteen counts of engaging in unlawful monetary transactions (transactional money laundering) in violation of 18 U.S.C. § 1957. Bush primarily contends that the government failed to prove that his money-laundering transactions involved the "profits" of criminal activities—a distinction he argues is necessary under the Supreme Court's decision in *United States v. Santos*, 553 U.S. 507 (2008). Because *Santos* and its progeny dealt with money laundering under a different statute, 18 U.S.C. § 1956, Bush's argument that *Santos* applies to a Section 1957 transactional-money-laundering conviction is a matter of first impression for this court. Although we hold that *Santos* applies to Section 1957 convictions, it provides no relief to Bush because his money-laundering and fraud offenses do not "merge" as the crimes in *Santos* did. Accordingly, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### I. Bush's Investment Schemes

Bush's convictions arise from his creation and operation of three different "high-yield" investment programs in the western United States from 1997 until 2006. Over the course of what ultimately amounted to a four-year, $36 million Ponzi scheme, Bush lured approximately 400 victims into "investing" with him.

In 1997, after several years of marketing lackluster consumer products, Bush met real-estate developer Duane

Christy, who was seeking financing to construct a luxury resort in Baja California to be known as Cabo San Quintin. Bush pledged that he could provide $800 million in financing to construct the resort. To raise this capital, Bush began promoting several high-yield investments to the public. Bush acquainted himself with other high-yield "promoters" by joining an organization called Global Prosperity. At various Global Prosperity workshops, Bush was introduced to other people involved in such schemes.

## A. Hulaman Management Services

In early 1999, Bush paid unlicensed and self-proclaimed "ecclesiastical lawyer" Glen Stoll to start an ethereal legal entity known as a "corporation soul." Stoll filed articles of incorporation in Washington state for an entity called Director of the Cornerstone Institute (Cornerstone). Bush began promoting securities known as "mid-term notes" under one of Cornerstone's auxiliary branches, Hulaman Management Services (Hulaman). Bush told investors that these notes generated profits from favorable interest-rate movements and that investors could reap substantial gains in just over a month. According to his investors, Bush promised an eight- to nine-percent return per year as well as a high probability of a twenty-five-percent return every four to six weeks. Rather than structure the notes and manage the money himself, Bush told investors that he was a "facilitator for high-yield investments."

Using his contacts from Global Prosperity, Bush reinvested money given to him in two trading programs: IFR Trust, operated by Larry Wilcoxson of California, and Mintus, Inc., operated by Carolyn Mintus of New York. At his trial, Bush explained his understanding of Mintus's program into which he was placing investors' money:

> Well, just the—that they made these tranches. These trades were down, and they bought and sold paper.

> I hear it called "mid-term bank note." I don't know what it is. Quite frankly I'm not a financier.

In addition to a return on his investments, Mintus offered Bush an $800 million guarantee for his planned investment in Cabo San Quintin.

Although Bush testified that he made no promises about the returns he could provide and that his trading programs were based on his "best efforts," his clients testified that he represented the investments as risk-free. He claimed the principal would remain in the investors' own accounts and was secured by real estate or promissory notes. Further, literature distributed by Bush indicated that his investment had minimal risk and could produce up to a 300-percent yearly return. According to a letter soliciting new investments, investor funds would be held "in trust" until the pool accumulated $1 million. At that point, the pooled funds would be transferred to Wilcoxson or Mintus who would then place the money with a "private merchant bank." After investors sent money, Bush sent them a Hulaman Trust International Trust and Fiduciary Agreement, which catalogued investors' funds under the reassuring heading "Assets Delivered in Trust." Soon after Bush began to invest with Mintus, she failed to make her first payment due to Bush. Despite this, Bush testified that he remained confident about the viability of Mintus's program and continued to place Hulaman-client money with her.

Bush recruited several individuals to assist him in promoting Hulaman. Chief among them was his longtime marketing partner Marilyn March. Bush also tapped Larry and Vicki Webster to work as "financial planners" and promoters, paying them a percentage of any funds they raised. Bush hired March's friend Tammy Stuckey to work as his administrative assistant. She was paid $1000 per week in cash. For his part, Bush told investors that he lived an ascetic life and "was merely a conduit for charity," using his profits from the trad-

ing program to fund his own charity, the From the Heart Foundation (Foundation).

Beginning in February 1999, and despite not receiving dividends from Mintus, Bush directed Stuckey to prepare and send client account statements to Hulaman investors showing balance increases of approximately twenty-five percent per month. Bush also began paying some investors twenty-five percent returns on their initial investments.

In July 1999, Bush and March purchased a property in Washington state known as View Park Golf Estate (View Park). Priced at $1.8 million, this 20-acre property included an 8,300 square-foot home, a golf course, tennis and basketball courts, and a fishing pond. Bush used funds from Hulaman's bank account to make the $250,000 down payment on View Park and pay the $10,000 per month mortgage. Bush and March used the home as a residence and meeting place for Hulaman investors and Foundation contributors. Bush hired groundskeepers, a chef, a masseuse, and a personal staff for View Park. In the summer of 1999, Bush hired new staff, including a personal secretary, to whom he paid a $125,000 salary into an offshore bank account. After several employees objected to being paid exclusively in cash, Bush began paying them through Kelly Temporary Services.

Using Hulaman money, Bush also entered into leases with the Seattle Mariners baseball team and Seattle Seahawks football team for luxury suites at their respective stadiums. Bush invited prospective investors to join him in the suites for various sporting events.

## B.   Global Dominion Financial Services

In August 1999, the Federal Bureau of Investigation (FBI) began probing Wilcoxson and Mintus, executing search warrants to gather evidence about their offerings of mid-term notes. One month later, Bush informed his investors that

Hulaman had moved its operations to the Caribbean island-nation of Nevis and was now operating under the moniker Global Dominion Financial Services (Global Dominion). Under Global Dominion, Bush promoted "high-yield" investments in "international financial institutions." Again promising an eight-percent annual return, with sporadic twenty-five-percent interest payments, Bush asked investors to wire transfer him money at the Bank Crozier in Grenada or to send money to his associate Nigel Grant, an attorney in Coronado, California. Bush told investors that a $1350 payment to Grant was necessary to establish the Nevis L.L.C., which would hold their money. Bush transferred all Hulaman files to Grant's law office in Coronado. After Bush's personal secretary traveled to Coronado to organize the files, Grant began sending account statements from his law office to Global Dominion investors.

Grant began posting investor account statements on Global Dominion's new website. For the first eight-week "trading period" under Global Dominion's watch, client statements showed a twenty-five percent return on investment. As was the case with Hulaman, neither Bush nor his associates at Global Dominion were reaping substantial returns from their investments in Mintus and Wilcoxson. Indeed, of the $12.3 million Bush claims to have invested with Wilcoxson and Mintus from both Hulaman and Global Dominion, Bush received back a pittance of $53,000. Nevertheless, Global Dominion continued to post new earnings to client account statements.

On October 28, 1999, Bush received a letter from the Washington State Department of Financial Institutions (DFI) which questioned the legality of his operations. Bush sought counsel from Stoll, his unlicensed "attorney." Stoll sent a letter on Bush's behalf to the DFI denying that Bush was connected to any improper activity.

Beginning in December 1999 and continuing through May 2000, Bush and his associates directed their office manager in

Nevis to transfer money from the Bank Crozier to various accounts in the United States. These included Mintus's account in New York, Grant's account in the Bahamas, and various Bush accounts in Seattle. Fifteen of these transactions to Bush's accounts, each in excess of $10,000, formed the basis for the unlawful monetary transaction charges in this case (Counts 18-32). According to Bush's office manager, money was never paid out to Global Dominion investors.

In May 2000, Bush began winding down Global Dominion. When investors called to inquire about the absence of dividends, Bush told an employee in Nevis to placate them by claiming there were delays at the Federal Reserve in New York that prevented wire transfers. When investors called back to see if the money had been freed up, employees repeated the lies.

## C.  Cornerstone Institute

In July 2000, Bush signed an installment contract that formalized his commitment to provide $800 million in financing for Cabo San Quintin. Thereafter, Bush began operating the Cornerstone Institute and recruited new investors for another mid-term notes scheme, purportedly secured by Bush's interest in Cabo San Quintin. Bush did not inform investors that his interest was subject to his satisfaction of the $800 million financing obligation. Bush provided prospective investors an application packet that included wire-transfer instructions and an escrow agreement. Investors received monthly account statements, which again reflected frequent and substantial dividend returns (sometimes 150 percent of the principal). Despite the good news communicated to investors, Bush was still not generating returns from Cabo San Quintin, Mintus, or Wilcoxson. By the end of 2001, he had paid less than $2 million out of the $300 million due under his obligation to the resort.

Since Bush was unable to find any new investors by 2002 to permit him to fund his Cabo San Quintin obligations, his

partners in Cabo San Quintin forced him out of the project. In June 2002, View Park was repossessed by its former owner after Bush and March stopped making payments on the mortgage. In July 2002, Bush moved to Paris.

In total, between 1998 and 2002, Hulaman, Global Dominion, and Cornerstone received more than $35.6 million from investors. As noted earlier, Bush placed $12.3 million in the Ponzi schemes run by Wilcoxson and Mintus. He also placed $233,500 with Wilcoxson personally and $6.1 million with Mintus personally. He paid $8.7 million back to investors who requested payments of dividends. He paid more than $3.7 million in expenses and salaries. Finally, he diverted $8.4 million to his own accounts, including $1.4 million in cash withdrawals, and funds used to purchase and make improvements to View Park, and to purchase artwork and make gifts to friends and family.

On August 9, 2006, a federal grand jury returned a thirty-two count Indictment against Bush. After being extradited from Poland in January 2008, Bush was arraigned in the Western District of Washington.

## II.  Bush's Trial and Sentence

Bush's two-week jury trial commenced in October 2008. At the close of the Government's case-in-chief, Bush did not move for a judgment of acquittal.

Bush testified at trial about his investment offerings and dealings with Wilcoxson and Mintus. He stated his belief that both of their investment programs were legitimate enterprises, even explaining how Mintus took impressive steps to "satisfy his due diligence." For instance, Bush claimed that at his first meeting with Mintus, she was accompanied by two former board members of the Federal Reserve Bank of New York. Bush detailed how he had divided investor money into three categories—transfers to Mintus, transfers to Mexico, and

operational expenses. Because he had "sworn secrecy" to his associates, Bush was unable to inform his investors about how he invested their money. When asked why he was using investor money "to buy the house and the SUVs and the masseuse and the chef," Bush responded, "The only reason I am doing that is because I believe that there is money sitting in New York that offset [sic] this." He then admitted he never told investors about Mintus's defaults. In total, Mintus purportedly owed Bush more than $200 million.

Bush shifted significant responsibility for planning the investment scheme to Grant and his other associates, claiming that Grant designed the structure of Global Dominion in Nevis, as well as its business plan. Although he stated that Grant and others had "completely" taken over Global Dominion in Nevis, Bush conceded that he could direct wire transfers.

Bush testified that the $1.6 million he and March spent to remodel View Park enabled them to use the property for the Foundation. He claimed that other expenditures amounted to "asset placement," and that his repeated $9,000 per day bank withdrawals were for charity and employee salaries.

Prior to charging the jury, Bush requested that the district court give an instruction predicated on an advice-of-counsel defense to fraudulent intent. Finding no factual basis in the trial record, the district court declined to give the instruction and, instead, gave an instruction that good faith is a complete defense to those charges where intent was at issue.

The jury convicted Bush on the securities-fraud count, eight wire-fraud counts, three mail-fraud counts, and all fifteen money-laundering counts. Bush was acquitted on five wire-fraud counts that did not involve financial transactions.

The district court sentenced Bush to 360 months imprisonment—240 months for the securities fraud, 120

months for the money laundering to run consecutive with 240 months, and 60 months for the wire fraud to run concurrent. The district court ordered Bush to pay $30.1 million in restitution and the $2,700 mandatory special assessment. This appeal followed. We have jurisdiction under 28 U.S.C. § 1291.

## DISCUSSION

Bush asserts two errors. First, he argues that there was insufficient evidence to convict him of engaging in unlawful monetary transactions under 18 U.S.C. § 1957 because the government did not prove that his bank transfers included the "profits" of his criminal activities. Second, he assigns error to the district court's refusal to give a jury instruction he proposed. Both contentions are without merit.

## I. Sufficiency of the Evidence for 18 U.S.C. § 1957 Convictions

This is the first proceeding where Bush has objected to the sufficiency of evidence submitted by the government to convict him of transactional money laundering. Evidence is sufficient for conviction "if, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Mincoff*, 574 F.3d 1186, 1192 (9th Cir. 2009) (quoting *United States v. Dearing*, 504 F.3d 897, 900 (9th Cir. 2007)) (internal quotation marks omitted). While we normally undertake such reviews de novo, because Bush failed to move for acquittal before the district court, we will only apply plain error analysis here and examine the conviction to ensure there was no manifest miscarriage of justice. *United States v. Green*, 592 F.3d 1057, 1065 (9th Cir. 2010).

Bush's argument is two-fold. First, he claims that his wire-fraud convictions are not distinct crimes from the fifteen money-laundering convictions. Bush asserts that "proceeds"

in the money laundering statute must mean the "profits," rather than the "receipts," of predicate crimes. He proffers the legal hypothesis that whenever a predicate offense to money laundering necessarily involves the payment of the crime's receipts, the money-laundering offense "merges" with the predicate crime. Assuming his premise is sound, Bush proceeds to his second argument that the government did not present evidence to allow the jury to distinguish which money he laundered for his personal "profit" and which he laundered to pay the "costs" of his Ponzi scheme.

## A.　Money Laundering "Proceeds"

[1] Enacted in 1986, the Money Laundering Control Act added to the Criminal Code two substantive offenses for laundering monetary instruments—18 U.S.C. §§ 1956 and 1957. Pub. L. No. 99-570 § 1352(a), 100 Stat. 3207-18, 21 (1986). Both statutes prohibit conducting monetary transactions with the "proceeds" of criminal activity, albeit in different ways. Section 1956(a)(1) uses "proceeds" twice in its substantive text, which provides:

> Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity . . . with the intent to promote the carrying on of specified unlawful activity . . . [shall be guilty of a crime].

By contrast, Section 1957(a) provides:

> Whoever, in any of the circumstances set forth in subsection (d), knowingly engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and

is derived from specified unlawful activity, shall be [guilty of a crime].

18 U.S.C. § 1957(a). While "proceeds" does not appear in Section 1957(a)'s description of the offense, subsection (f)(2) incorporates the term into the statute when it defines "criminally derived property" to mean "any property constituting, or derived from, *proceeds* obtained from a criminal offense." *Id.* § 1957(f)(2) (emphasis added). At the time relevant here, Section 1957(f)(3) provided that " 'specified unlawful activity' has the meaning given that term in section 1956." *Id.* § 1957(f)(3).[1]

**[2]** The meaning of "proceeds" in Section 1956 has received significant judicial attention in recent years after the Supreme Court's plurality decision in *United States v. Santos*, 553 U.S. 507 (2008). Two of our decisions—*United States v. Van Alstyne*, 584 F.3d 803 (9th Cir. 2009), and *United States v. Moreland*, 622 F.3d 1147 (9th Cir. 2010)—have wrestled with the meaning of Justice Scalia's four-judge plurality opinion in *Santos*, as well as Justice Stevens's concurrence.

The defendant in *Santos* was convicted, *inter alia*, of operating an illegal lottery and Section 1956 money laundering. 553 U.S. at 509-10. After he received money from gamblers, Santos paid a commission to his employees and then paid lottery winners. *Id*. Those payments formed the basis of the money-laundering charges. *Id.* In post-conviction habeas proceedings, Santos challenged the propriety of his money-laundering conviction, claiming his transactions were merely the distribution of receipts from gamblers—in the form of

---

[1]In 2009, after the events at issue here, Section 1957(f)(3) was amended to provide that "the terms 'specified unlawful activity' *and 'proceeds'* shall have the meaning given those terms in section 1956 of this title." *Id.* § 1957(f)(3) (emphasis added). Pub. L. No. 111-21, § 2(f)(2), 123 Stat. 1618 (2009). Our discussion here is thus limited to the pre-amendment context.

payments to runners, winners, and collectors—as opposed to the *profits* of the illegal lottery. *Id.* at 510. The district court and Seventh Circuit agreed and vacated the money-laundering convictions.

**[3]** The Supreme Court affirmed, although no opinion commanded a majority of the Court. In the four Justice plurality opinion, Justice Scalia held that because "proceeds," as then defined under Section 1956,[2] could fairly be interpreted to mean either "profits" or "receipts," the rule of lenity meant that "the tie [went] to the defendants." *Id.* at 514-15. In *Santos*, accepting the government's proffered interpretation that proceeds meant "receipts" would yield a peculiar result— every person who operated an illegal lottery would, by default, simultaneously commit money laundering "because paying a winning bettor is a transaction involving receipts." *Id.* at 515-16. This created a "merger problem." *Id.* at 516. The plurality went on to note that this "merger problem" was not limited to transactions in furtherance of an illegal lottery and noted that "[f]or a host of predicate crimes, merger would depend on the manner and timing of payment for the expenses associated with the commission of the crime." *Id*. Justice Scalia highlighted that "[t]he Government suggests no explanation for why Congress would have wanted a transaction that is a normal part of a crime it had duly considered and appropriately punished elsewhere in the Criminal Code to radically increase the sentence for that crime." *Id.* at 517.

Unwilling to categorically define "proceeds" to mean "profits," Justice Stevens concurred in the judgment and limited his opinion to the illegal gambling context. *Id.* at 526-28 (Stevens, J., concurring in the judgment). His concurrence endorsed the plurality's view on merger as applied to illegal gambling prosecutions. *Id.* at 528 (quoting plurality opinion).

---

[2]In 2009, Congress amended Section 1956(c)(9) to expressly define proceeds to include "gross receipts" of unlawful activity. Pub. L. No. 111-21, § 2(f)(1), 123 Stat. 1618.

**[4]** In *Van Alstyne*, we considered the import of *Santos* for the first time. *See* 584 F.3d at 813. There, we overturned two money-laundering convictions committed in furtherance of a Ponzi scheme when the evidence at trial showed the transactions were merely putative dividends paid by the defendant for the purpose of encouraging further principal contributions by investors. *Id.* at 809-10, 815. We posited that " 'proceeds' means 'profits' where viewing 'proceeds' as 'receipts' would present a 'merger' problem of the kind that troubled the plurality and concurrence in *Santos*.' " *Id.* at 814. We reasoned that *Santos* did not examine the money-laundering statute itself but, rather, inquired into the elements and purpose of the predicate offense from which the laundered funds were derived. *See id.* at 814-15 (considering the elements and purpose of the mail-fraud statute). Because fraud statutes prohibit the broader "scheme to defraud" as opposed to the completed fraud, *id.* (citing *Neder v. United States*, 527 U.S. 1, 25 (1999)), the appropriate test was whether the money laundering "was a central component of" the defendant's criminal scheme. *Van Alstyne*, 584 F.3d at 815. Because two of Van Alstyne's transactions furthered his fraud by encouraging new investment to the Ponzi scheme, we adhered to Justice Scalia's reasoning that a defendant should not be punished for "[t]ransactions that normally occur during the course of running a[n illegal scheme]." *Santos*, 553 U.S. at 517. Consistent with this view, we upheld Van Alstyne's third money-laundering conviction because it concerned a transaction to refund an investor's principal outlay and thereby left fewer funds "available to lull other investors into maintaining their investment." *Van Alstyne*, 584 F.3d at 816.

More recently, in *Moreland*, we again applied the "central to the scheme to defraud" framework where the defendant used a pyramid scheme to obtain in excess of $73 million from investors. *Moreland*, 622 F.3d at 1153, 1165-66. *But cf. United States v. Webster*, 623 F.3d 901, 906 (9th Cir. 2010) ("We . . . read *Santos* as holding that where, as here, a money laundering count is based on transfers among co-conspirators

of money from the sale of drugs, 'proceeds' includes all 'receipts' from such sales."). We reversed two money-laundering convictions that corresponded to "wire transfers for the purpose of paying commissions . . . central to carrying out the scheme's objective of encouraging further investment." *Moreland*, 622 F.3d at 1166. On grounds not relevant here, we upheld several other money-laundering counts in *Moreland* because the jury instructions did not require a specific showing of "proceeds," and it was thus irrelevant whether "profits" of the illegal activity were involved. *Id.* at 1167.

## B.    Applicability of *Santos* to 18 U.S.C. § 1957

**[5]** Because Bush was convicted of engaging in unlawful monetary transactions under 18 U.S.C. § 1957, while *Santos, Van Alstyne*, and *Moreland* all concerned money laundering under the companion Section 1956, we first consider whether Bush's convictions are covered by *Santos* and its progeny. The government briefly notes that *Santos*'s applicability "is not clear and obvious" in this context. We decline to draw such a superficial distinction between two coordinate statutes and hold that *Santos* applies with equal force to transactions prosecuted under Section 1957.

**[6]** As noted earlier, Sections 1956 and 1957 contain different elements but have a common genesis. For purposes here, the statutory differences do not concern the usage or meaning of "proceeds"; instead the crimes differ with respect to the "knowledge" element. Section 1957 "does not require that the defendant know of a design to conceal aspects of the transaction or that anyone have such a design," while Section 1956 has that requirement. *See United States v. Wynn*, 61 F.3d 921, 926-27 (D.C. Cir. 1995) (citation omitted). Both sections make explicit use of the word "proceeds," and since they were enacted together in the Money Laundering Control Act, we follow the " 'normal rule of statutory construction' that 'identical words used in different parts of the same act are intended

to have the same meaning.' " *Dep't of Revenue of Or. v. ACF Indus., Inc.*, 510 U.S. 332, 342 (1994) (citations and some internal quotation marks omitted). Our reading of the terms as synonymous across these statutes is supported further by the cross-reference in Section 1957(f)(3) that " 'specified unlawful activity' has the meaning given the term in section 1956" and further buttressed by the fact that both sections target money-laundering transactions. 18 U.S.C. § 1957(f)(3); *see Brown*, 513 U.S. at 118 ("Textual cross-reference confirms this conclusion."); *cf.*, *Envtl. Def. v. Duke Energy Corp.*, 549 U.S. 561, 583 (2007) (Thomas, J., concurring) ("When Congress repeats the same word in a *different statutory context*, it is possible that Congress might have intended the context to alter the meaning of the word.") (emphasis added). Likewise, the Sixth Circuit, in holding that *Santos* applies to Section 1957 concluded that "[i]t makes particular sense [to give the words an identical meaning] here because the two statutes cover the same subject matter in a common way." *United States v. Kratt*, 579 F.3d 558, 560 (2009).

**[7]** The statutory symmetry between Sections 1956 and 1957 is but one reason to extend the meaning of *Santos*. Even more important is that *Santos* and its progeny are less an examination of the money-laundering statutes and more an inquiry into the predicate crimes which generate funds to be laundered. *See Santos*, 553 U.S. at 516 ("For a host of predicate crimes, merger would depend on the manner and timing of payment for the expenses associated with the commission of the crime."). As we highlighted in *Van Alstyne*, the import of *Santos* is its requirement that a court evaluate whether the government has been redundant in its prosecution of a fraudulent scheme—that is, whether the charges separate necessary parts of the whole and treat them as independent bases for criminal liability. *See Van Alstyne*, 584 F.3d at 815 (citing *Santos*, 553 U.S. at 515-17). For Santos to have run his lottery, he *had* to pay his employees and the lottery winners— indeed, without such payments his crime was nothing but simple theft. Thus, the *Santos* merger problem is not limited to

Section 1956 because the "merger" problem is not so confined. *See Iannelli v. United States*, 420 U.S. 770, 772-73, 791 (1975) (considering merger in criminal conspiracy context).

**[8]** Finally, because Section 1957 does not contain a knowledge requirement and, thus, likely prohibits a broader scope of criminal activity than Section 1956, an interpretation which unduly limits *Santos*'s context could allow the government to sidestep its holding by charging money laundering under Section 1957. Accordingly, we hold that under 18 U.S.C. § 1957, where a transaction in criminally-derived property creates a "merger" problem of the kind that troubled the plurality and concurrence in *Santos*, or our court in *Van Alstyne*, the "proceeds" transacted must include the "profits" of the predicate criminal activity.

## C.   The Absence of Merger in Bush's Conviction

**[9]** We next consider whether Bush's money-laundering convictions present the merger problems of *Santos* or *Van Alstyne*. Because the district court did not specifically instruct the jury that "proceeds" must include "profits," if such a merger problem exists, then the jury instructions were erroneous.

The eighteen monetary transactions at issue here occurred during a finite period of Bush's overall scheme—from December 29, 1999 to May 24, 2000. All involved transfers from Bank Crozier to bank accounts controlled by Bush in Washington state. The transactions occurred during the second phase of the overall Ponzi scheme when Bush and Grant operated under the Global Dominion name. The stage of the transactions in the context of the larger fraud is particularly important because the timing reveals their irrelevance to the overarching fraudulent scheme.

**[10]** The circumstances surrounding the securities, wire, and mail-fraud convictions were all distinct from the money

laundering, thus alleviating any merger concerns. First, the securities fraud conviction (Count 1) related to a January 2002 attempted sale of an investment contract in Cabo San Quintin—a fraud that occurred more than 18 months after the last money-laundering transaction charged in the Indictment. Likewise, the mail-fraud convictions (Counts 15-17) have no connection to the transfers—rather the mail fraud was based on Bush's promotional activities and the sending of false documents to clients. With respect to two of the wire-fraud charges (Counts 12 and 13), the transactions involved transfers from a bank in Oregon to Bush's accounts in Washington after the money laundering was completed.

**[11]** This leaves only six wire-fraud charges (Counts 2-7) which could present "merger" problems. Unlike the cases analyzed earlier, however, none of the transactions from Bank Crozier to Bush was "central to carrying out the scheme's objective[s]." *Moreland*, 622 F.3d at 1166. The necessity of the transfers from Bank Crozier was limited to Bush's personal interest in veiling the sources of his income from public authorities. Unlike *Moreland*, the Government showed that Bush engaged in the transfers from Bank Crozier primarily as a means to benefit himself. This was evidenced by the fact that Bush operated his scheme for several years without making these international transfers from Bank Crozier. Notably, the overseas money transfers began *after* authorities began investigating Hulaman, Mintus, and Wilcoxson. Rather than risk investors sending money directly to his Hulaman account, Bush deflected attention by steering the investments overseas first. While this is not as detrimental to the Ponzi scheme as the defendant in *Moreland* refunding an investor's principal, it also did not directly assist Bush in generating new investments. Taking additional steps to hide completed criminal activity is not central to the solicitations necessary for a Ponzi scheme to continue operating. Further, we decline to endorse a merger rule that would reward criminals for increasing nefarious behavior by taking additional steps to avoid justice.

Bush's argument that the government did not distinguish which of his transfers from Bank Crozier to the Washington accounts were "costs" and which were "profits" is a red herring. In a period of six months, Bush moved more than $2.48 million from overseas accounts to pay approximately $9,000 in weekly costs. These "costs" included "business necessities" like his home, personal bills, and suites at football and baseball games—all outlays which benefitted Bush as much as they did his clients or associates. Bush's profligacy is not a basis for weaving money laundering into a Ponzi scheme.

Finally, we note that in *Kratt*, the Sixth Circuit also considered whether the inclusion of the money-laundering charge under Section 1957 led to "a radical increase in the statutory maximum sentence" for the underlying offense. 579 F.3d at 562. Bush's money-laundering convictions, only some of which even present the possibility of merger, had the possibility of adding ten years to his overall sentence. 18 U.S.C. § 1957(b)(1). By contrast, his mail and wire-fraud convictions had thirty-year statutory maximums. 18 U.S.C. §§ 1341, 1343. This is quite distinct from *Santos*, where the operation of an illegal lottery carried only a five-year sentence while money-laundering under Section 1956 could have led to an additional twenty years of imprisonment. *See* 553 U.S. at 516. In the end, Bush received five additional years for his money laundering—hardly a "radical" disparity from the twenty-five-year sentence for his various frauds.

**[12]** Since Bush does not dispute that he executed the transactions in question and because those transactions did not merge with his predicate frauds, we hold that there was sufficient evidence to convict Bush of transactional money laundering under 18 U.S.C. § 1957.

## II. Advice of Counsel Instruction

Bush's second claim on appeal concerns the district court's refusal to give an "advice-of-counsel" instruction. We review

a district court's determination "that a factual foundation does not exist to support a jury instruction proposed by the defense for an abuse of discretion." *United States v. Daane*, 475 F.3d 1114, 1119 (9th Cir. 2007) (quotations omitted).

**[13]** Bush requested the following instruction:

> As I have explained, one element which the government must prove beyond a reasonable doubt is that defendant had the unlawful intent to [commit] securities fraud, wire fraud, mail fraud. Evidence that the defendant in good faith followed the advice of counsel would be inconsistent with such an unlawful intent. Unlawful intent has not been proved if the defendant, before acting, made full disclosure of all material facts to an attorney, received the attorney's advice as to the specific course of conduct that was followed, and reasonably relied on the advice in good faith.

Finding no basis in the record to support the advice-of-counsel instruction, the district court gave a broader good-faith instruction:

> An intent to defraud is an intent to deceive or cheat. Good faith is a complete defense to each count, because good faith is inconsistent with an intent to defraud. Good faith means a belief or opinion honestly held without an intent to mislead. However, the defendant's belief that victims of any fraud will be paid in the future or will sustain no economic loss does not constitute a good-faith offense [defense] if there is an intent to defraud.
>
> The defendant does not have the burden of proving he acted in good faith. The government must prove beyond a reasonable doubt that the defendant acted with the intent to defraud and did not act in good

faith. Proof that the defendant acted with reckless disregard for the truth of material misrepresentations he may have made is inconsistent with good faith.

**[14]** "A defendant is entitled to have the judge instruct the jury on his theory of defense, provided that it is supported by law and has some foundation in the evidence." *United States v. Bello-Bahena*, 411 F.3d 1083, 1088-89 (9th Cir. 2005) (quoting *United States v. Fejes*, 232 F.3d 696, 702 (9th Cir. 2000)). An advice-of-counsel instruction requires the defendant show that he made a full disclosure of all material facts to his attorney and that he then relied "in good faith on the specific course of conduct recommended by the attorney." *United States v. Ibarra-Alcarez*, 830 F.2d 968, 973 (9th Cir. 1987). We have repeatedly recognized that the failure to give a requested instruction is not reversible error "if other instructions, in their entirety, adequately cover that defense theory." *United States v. Mason*, 902 F.2d 1434, 1438 (9th Cir. 1990); *see also United States v. Crandall*, 525 F.3d 907, 912 (9th Cir. 2008).

As applied here, Bush needed to present evidence that he fully advised his attorney of his plan, received advice regarding that plan from the attorney, and followed that exact advice in good faith. The district court found none of these predicates were met, and we agree.

**[15]** The district court found that, for his "legal advice," Grant was "paid almost $2 million, which is a pretty good fee for corporate advice." We agree with the district court that Grant was "up to his eyeballs" in the fraudulent scheme and not serving in the role of Bush's legal adviser. Grant was positioned as a business partner, sending out account statements and retaining investor account files at his law office. Moreover, Bush never revealed to anyone his own fruitless investments in the schemes run by Mintus and Wilcoxson—essential facts necessary to convey a full and accurate story to Grant. The record is replete with evidence on which the dis-

trict court could have, and did, base its decision not to give Bush's requested instruction, and we find no abuse of discretion.

**[16]** Finally, even if Bush had established a basis for the advice-of-counsel instruction, the broader good-faith instruction given by the district court subsumes Bush's proposed instruction. Because "[a]dvice of counsel is not regarded as a separate and distinct defense but rather as a circumstance indicating good faith which the trier of fact is entitled to consider on the issue of fraudulent intent," *Bisno v. United States*, 299 F.2d 711, 719 (9th Cir. 1961), and the district court gave a good-faith instruction, there was no error. *See also Ibarra-Alcarez*, 830 F.2d at 973.

## CONCLUSION

For the foregoing reasons, Bush's conviction and sentence are AFFIRMED.

**AFFIRMED.**