PUBLISHED

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 12-4469

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

KEITH FRANKLIN SIMMONS,

Defendant - Appellant.

Appeal from the United States District Court for the Western District of North Carolina, at Charlotte. Robert J. Conrad, Jr., Chief District Judge. (3:10-cr-00023-RJC-DCK-1)

Argued: October 29, 2013          Decided: December 11, 2013

Before NIEMEYER and MOTZ, Circuit Judges, and John A. GIBNEY, Jr., United States District Judge for the Eastern District of Virginia, sitting by designation.

Affirmed in part, reversed in part, vacated in part, and remanded by published opinion. Judge Motz wrote the opinion, in which Judge Gibney joined. Judge Niemeyer wrote a dissenting opinion.

**ARGUED**: Joshua B. Carpenter, FEDERAL DEFENDERS OF WESTERN NORTH CAROLINA, INC., Asheville, North Carolina, for Appellant. William Michael Miller, OFFICE OF THE UNITED STATES ATTORNEY, Charlotte, North Carolina, for Appellee. **ON BRIEF**: Henderson Hill, Executive Director, Ann L. Hester, FEDERAL DEFENDERS OF WESTERN NORTH CAROLINA, INC., Charlotte, North Carolina, for Appellant. Anne M. Tompkins, United States Attorney, Amy

Elizabeth Ray, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Asheville, North Carolina, for Appellee.

DIANA GRIBBON MOTZ, Circuit Judge:

Keith Simmons appeals his convictions on one count of securities fraud, one count of wire fraud, and two counts of money laundering, as well as his sentence of fifty years' imprisonment. We affirm his fraud convictions but reverse his money-laundering convictions because the transactions prosecuted as money laundering constituted essential expenses of his underlying fraudulent scheme. Accordingly, we affirm in part, reverse in part, vacate his sentence, and remand for further proceedings consistent with this opinion.

## I.

### A.

From April 2007 to December 2009, Simmons operated a $35 million Ponzi scheme called Black Diamond Capital Solutions. With help from a network of self-styled hedge fund managers, Simmons recruited more than 400 investors by promising to invest their money in a lucrative and exclusive foreign currency exchange, or "Forex" fund. Simmons told investors that only ten or twenty percent of their investment would be at risk at any given time. He sent them monthly earnings statements reporting sizeable profits. And he promised them that, after an initial ninety-day period, they could withdraw their money at will.

Numerous investors tested Simmons's promise and withdrew a portion of their money after ninety days had passed. Upon the receipt of these returns, which seemed to evidence Black Diamond's legitimacy and profitability, many investors sent even more money to Simmons. Some recruited their friends to invest with Simmons as well.

In fact, no Forex fund existed and Simmons never invested a cent of his victims' funds. Simmons fabricated the earnings reports, and he paid the purported returns to early investors from deposits made by later ones.[1] Rather than investing his victims' funds as promised, Simmons treated their investments as his personal piggy bank. He purchased $4.6 million in real estate, invested $1.2 million in an extreme fighting venture, funneled $2.2 million to his other businesses, and bought lavish gifts and trips for his employees and girlfriends.

Greed provoked the Ponzi scheme, and greed doomed it. As more investors sought to withdraw their funds, Simmons told a series of escalating lies to "string out" investors and delay withdrawals. First, he claimed that withdrawals were interfering with the fund, and that he would henceforth limit withdrawals in order to reduce the fund's volatility. Later, he

---

[1] Simmons paid out a total of $19 million, but only $9 million made its way to actual investors. Corrupt hedge fund managers, who served as middle-men between Simmons and some of his investors, siphoned off the rest.

asserted that he was negotiating with a German named Klaus Bruner, who allegedly planned to cash out investors and take over the account. And Simmons told some investors that the FBI itself was impeding some withdrawals.

Simmons was lying. In 2009, when investors' earning statements reflected a total of more than $292 million, the Black Diamond bank account had in fact dwindled to $523.60. Still, Simmons told investors that their money was safe.

By July 2009, Simmons permitted no further withdrawals by investors. After that date, Simmons managed to attract only one new investor. Moreover, existing investors began demanding their money back. And as victim-investors became more alarmed, Simmons's dissembling became more desperate. Finally, in December 2009, the FBI raided his offices. During a long conversation with an FBI agent, Simmons confessed to the fraud.

Ultimately, Simmons's Ponzi scheme cost his victims more than $35 million. Many lost their life savings. Some lost their families. Many became depressed, even suicidal, after learning that their money was gone.

B.

The Government indicted Simmons on one count of securities fraud, one count of wire fraud, and two counts of money laundering. The fraud counts arose from Simmons's role in the Ponzi scheme itself, which, according to the superseding

5

indictment, took place from April 2007 to December 2009. The indictment did _not_ predicate Simmons's two fraud charges on discrete instances of fraud; rather, it charged Simmons with a two-and-one-half year "scheme to defraud," specifically claiming that Simmons executed "what is commonly known as a ponzi scheme." Simmons's money-laundering counts, by contrast, arose from two discrete payments to investors made in 2008. The Government alleged that these payments also involved the "diver[sion of] investor money back to other investors in ponzi-fashion . . . to induce further investments by investors and their friends and family members."

Simmons proceeded to trial in December 2010. Nine of his victims testified against him, as did certain hedge fund managers, an IRS agent, and the FBI agent to whom Simmons confessed. Simmons did not testify. His counsel argued that he was a neophyte financier who never intended to defraud his investors. The jury, however, convicted him on all counts.

After Simmons's conviction, a probation officer drafted a presentence report calculating Simmons's recommended term of imprisonment. The probation officer recommended an offense level of 43 -- the maximum level permitted under the Guidelines -- and a criminal history category of I. This offense level and criminal history category produced a Guidelines-recommended sentence of 960 months' imprisonment.

The district court varied downward from the probation officer's recommendation and sentenced Simmons to 600 months' imprisonment. Specifically, the court sentenced Simmons to 240 months on the securities-fraud count, a consecutive term of 240 months on the wire-fraud count, and 240-month terms on each of the two money-laundering counts -- 120 months of which was to be served consecutively to the fraud counts, and 360 months of which was to be served concurrently. The court acknowledged that this was an "enormous" sentence, but explained that it could not "remember another case that involved such devastating, life wrecking" greed. The court concluded that a fifty-year sentence was sufficient, but not greater than necessary, to accomplish justice.

## II.

On appeal, Simmons primarily challenges his money-laundering convictions.[2] He claims that the trial court erred by

---

[2] Simmons also challenges all of his convictions on the general ground that the district court violated due process by admitting three pieces of assertedly irrelevant victim-impact testimony. Even if the court erred in admitting this evidence, any error was harmless. Overwhelming evidence supported the jury verdict. Nine testifying victims traced the fraud directly to Simmons. He confessed his role in the Ponzi scheme to an FBI agent, who also testified. And the fraud left a paper trail that pointed straight to Simmons. Thus, given the wealth of evidence against Simmons, even if the admission of brief victim-impact testimony was error, the guilty verdict "was surely (Continued)

7

declining to grant his motion for judgment of acquittal on those counts. We review the denial of a motion for judgment of acquittal de novo. United States v. Mehta, 594 F.3d 277, 279 (4th Cir. 2010).

## A.

The federal promotional money-laundering statute makes it a crime to engage in a "financial transaction" involving "the proceeds of specified unlawful activity" with the intent to "promote the carrying on" of that activity. 18 U.S.C. § 1956(a)(1)(A)(i) (2006). The statute defines "specified unlawful activity" to encompass more than 250 predicate crimes, including securities fraud and wire fraud. Id. at § 1956(c)(7)(A).

Both of Simmons's money-laundering convictions arose from payments that he made to investors during the course of his Ponzi scheme. The first conviction was based on a wire transfer of $150,000 to James Bazluki on March 14, 2008. Bazluki had invested $250,000 in Black Diamond prior to receiving this return; after receiving it, Bazluki invested another $70,000. The second money-laundering conviction was based on a wire transfer of $16,000 to Till Lux on October 22, 2008. Lux had

---

unattributable to the error." Sullivan v. Louisiana, 508 U.S. 275, 279 (1993).

invested $40,000 in Black Diamond. He testified that after recovering the $16,000, he subsequently convinced many of his friends to invest in Black Diamond. Lux also continued to withdraw money from Black Diamond, and ultimately turned a small profit on his investment. Simmons contends that these payments did not involve "proceeds" of unlawful activity as required to constitute money laundering.

His argument relies on United States v. Santos, a 4-1-4 decision in which the Supreme Court reversed the money-laundering convictions of a defendant convicted of both running an illegal gambling business and money laundering. 553 U.S. 507 (2008). Santos's gambling counts arose from his operation of an illegal lottery through a network of local bars and restaurants. The money-laundering counts were based on payments by Santos to the "runners" and "collectors" who helped operate the lottery, and to the lottery winners themselves. The lower court concluded that these payments involved the "proceeds" of operating an illegal lottery, and could therefore constitute grounds for money-laundering convictions.

Five members of the Supreme Court disagreed. A four-Justice plurality concluded that the term "proceeds" in the money-laundering statute was ambiguous -- it could mean either "receipts" or "profits" -- and invoked the rule of lenity to resolve the ambiguity in favor of the defendant. Id. at 514

(plurality opinion). The plurality thus concluded that the money-laundering statute only covers transactions involving "profits" of criminal activity. Id. at 524.

In rejecting the statute's broader interpretation, the plurality found that construing "proceeds" to mean "receipts" would create a "merger problem." Id. at 515. The plurality explained that those who run illegal gambling businesses must necessarily pay their accomplices and the lottery's winners. If a defendant could commit money laundering merely by "paying the expenses of his illegal activity," all illegal gambling businesses would involve money laundering, and the Government could punish a defendant twice for an offense that Congress intended to punish only once. Id. at 517.

This merger problem, the plurality noted, is not limited to illegal gambling. Writing for the plurality, Justice Scalia explained:

> Few crimes are entirely free of cost, and costs are not always paid in advance. Anyone who pays for the costs of a crime with its proceeds -- for example, the felon who uses the stolen money to pay for the rented getaway car -- would violate the money-laundering statute. And any wealth-acquiring crime with multiple participants would become money laundering when the initial recipient of the wealth gives his confederates their shares. Generally speaking, any specified unlawful activity, an episode of which includes transactions which are not elements of the offense and in which a participant passes receipts on to someone else, would merge with money laundering.

10

Id. at 516. The plurality concluded that interpreting "proceeds" to mean "profits" would resolve the merger problem by ensuring that defendants cannot be convicted of money laundering merely for paying the essential "crime-related expenses" of the predicate crime. Id. at 515.

Justice Scalia devoted much of the plurality opinion to challenging the dissent's prediction that applying the "profits" interpretation would undermine the viability of "the very cases that money laundering statutes principally target, that is, cases involving large-scale criminal operations that continue over a substantial period of time." Santos, 553 U.S. at 538-39 (Alito, J., dissenting). The dissent warned that, following the plurality's approach, the money-laundering statute could not reach long-term criminal enterprises in which the distinction between payments of "essential expenses" and payments dispensing criminal profits may often be unclear. But the plurality dismissed the dissent's concerns as baseless. According to the plurality, determining the lifespan of a long-term criminal enterprise, for purposes of evaluating whether the enterprise produced profits, would raise no difficulties because an enterprise lasts "as long as the Government chooses to charge." Id. at 520 n.7 (plurality opinion). Because the Government selects the lifespan of the predicate crime, it must prove that payments charged as money laundering during that lifespan

11

involved profits, rather than essential expenses, of the predicate crime. Id.

Justice Stevens provided the crucial fifth vote to reverse Santos's money-laundering convictions, but did not endorse the plurality's view that "proceeds" always means "profits." Rather, Justice Stevens concluded that courts should resolve the scope of the term "proceeds" on a case-by-case basis by reference to congressional intent. Id. at 525 (Stevens, J., concurring). Justice Stevens grounded his conclusion on the merger problem identified by the plurality. He concluded that using funds earned through an illegal lottery business to pay the "essential expenses" of that business cannot constitute money laundering. Id. at 528. And he agreed with the plurality that there was "no explanation for why Congress would have wanted a transaction that is a normal part of a crime it had duly considered and appropriately punished elsewhere in the Criminal Code, to radically increase the sentence for that crime." Id. Justice Stevens concluded that Congress could not have intended such a perverse result. Id.

B.

Congress amended the money-laundering statute in May 2009; that amendment effectively overruled Santos, defining proceeds to include "gross receipts." Fraud Enforcement and Recovery Act of 2009, Pub. L. No. 111-21, § 2(f)(1), 123 Stat. 1617, 1618

12

(2009) (codified at 18 U.S.C. § 1956(c)(9)).  However, because the amendment was not enacted at the time of the conduct giving rise to Simmons's money-laundering convictions, this expanded definition of "proceeds" does not apply in this case.  We are therefore called on to wade into the murky Santos waters, as we have in three previous published opinions.

In United States v. Halstead, we considered the reach of Santos in the context of a defendant convicted of healthcare fraud and money laundering.  634 F.3d 270 (4th Cir. 2011).  Halstead's fraud convictions arose from his scheme to capitalize on his patients' healthcare benefits by making phony medical diagnoses.  His money-laundering conviction, by contrast, arose from his transfer of the illicit gains into his personal bank account.  He claimed that Santos prohibited his money-laundering conviction because transferring his ill-gotten gains into his own coffers constituted an "essential expense[] of operating" his healthcare fraud.  Santos, 553 U.S. at 528 (Stevens, J., concurring).

To resolve Halstead's argument we first examined what, exactly, Santos held -- a task complicated by the fractured disposition.  Relying on Marks v. United States, 430 U.S. 188 (1977), we interpreted Santos narrowly to bind lower courts only in cases where illegal gambling constituted the predicate for the defendant's money-laundering conviction.  Halstead, 634 F.3d

13

at 279.  But, because the merger problem provided the "driving force" behind both the plurality's and Justice Stevens's opinions, we recognized that Santos compelled us to construe the money-laundering statute so as to avoid punishing a defendant twice for the same offense.  Id. at 278-79.  We concluded that a defendant cannot be convicted of money laundering merely "for paying the essential expenses of operating the underlying crime."  Id. at 278 (quotation marks omitted).  But if "the financial transactions of the predicate offense are different from the transactions prosecuted as money laundering" no merger problem arises.  Id. at 279-80.

Applying this rule to Halstead, we held that no merger problem tainted his money-laundering conviction.  His healthcare fraud was "complete" as soon as he received the ill-gotten healthcare reimbursements.  Transferring these reimbursements into his own account thereafter constituted an altogether "separate" offense that the Government properly prosecuted as money laundering.  Id. at 280.

After Halstead, we twice returned to Santos and its elusive merger problem.  In United States v. Cloud, we considered a defendant convicted of mortgage fraud -- for fraudulently luring home-buyers into making bad real-estate investments -- and money laundering -- for paying kickbacks to the accomplices who helped him locate his victims.  680 F.3d 396 (4th Cir. 2012).  We

14

reversed Cloud's money-laundering convictions, concluding that the kickbacks constituted "essential expenses" of the mortgage-fraud scheme because "Cloud's mortgage fraud depended on the help of others, and their help, in turn, depended upon payments from Cloud." Id. at 406. Because Cloud's scheme "could not have succeeded" without the kickbacks, we held that convicting him separately for these transactions would present the very same merger problem identified in Santos. Id. at 407.

A few months ago, in United States v. Abdulwahab, we again relied on Santos to reverse a defendant's money-laundering convictions. 715 F.3d 521 (4th Cir. 2013). Abdulwahab had committed an elaborate investment fraud, and the jury convicted him of money laundering based on payments he made to his co-conspirators to carry out that fraud. Id. at 506-07. As in Cloud, we found that these payments "were for services that played a critical role in the underlying fraud scheme" because they persuaded confederates to participate in the crime. Id. at 531. Abdulwahab resembled the paradigmatic felon, recognized by the Santos plurality, who uses "stolen money to pay for the rented getaway car." Id. We therefore concluded that the same merger problem presented in Santos barred his money-laundering convictions. Id.

15

                              III.

     Simmons argues that <u>Santos</u>, <u>Halstead</u>, <u>Cloud</u>, and <u>Abdulwahab</u>
require that we reverse his money-laundering convictions.  He
claims that his payments to investors did not involve "proceeds"
of criminal activity but rather "essential expenses" of
maintaining his Ponzi scheme.  And he maintains that convicting
him separately of money laundering for payments that were
essential to accomplishing his fraud would raise the same fatal
merger problem identified in <u>Santos</u>.  The Government, by
contrast, argues that Simmons's fraud did not depend on payments
to investors and that these payments were not essential to the
fraud.  The Government therefore maintains that Simmons's money-
laundering convictions should be affirmed.

                               A.

     After considering the record in this case, the parties'
arguments, and controlling law, we conclude that Simmons's
money-laundering convictions cannot stand.  The evidence
admitted at Simmons's trial irrefutably established that the
ongoing success of his Ponzi scheme depended on payments to
earlier investors, including those payments charged in the
money-laundering counts.

     The evidence against Simmons confirmed the commonsense
notion that people generally do not send money into unproven
investment schemes without some evidence that they will see

                               16

their money again.  Early payments from Simmons provided his victims with just such evidence.  Thus, the $9 million dollars that Simmons paid to early investors was essential to perpetuating the fraud scheme that ultimately earned him more than $35 million.  Indeed, James Bazluki -- the victim whose payment formed the basis of Simmons's first money-laundering count -- testified that the fact that he "was able to request money out of the account" convinced him "that this was a good place to have [his] money" and prompted him to make further investments.  And Till Lux -- whose payment formed the basis of Simmons's other money-laundering count -- testified that the fact that he was able to withdraw from his account made him "100 percent confident" in his investment, convinced him that his gains were "not just on paper," and made him encourage his friends to invest.  In sum, the very victims who received the payments that formed the basis for Simmons's money-laundering charges unequivocally testified to the critical importance of those payments in fostering the (misplaced) confidence necessary to perpetuate the fraud.

That Simmons's fraud continued for five months after the payments to existing investors stopped does not alter this fact. When payments ceased in July 2009, Simmons managed to attract only one new investor.  And, as soon as the payments ceased, existing investors started demanding the answers that led to the

17

scheme's prompt unraveling.  That Simmons managed, through lies and dissembling, to extend a fraud that had endured for more than two years for an additional five months without paying any new returns to investors does not prove that those payments were unnecessary to the scheme.  If anything, the rapid unraveling of the Ponzi scheme when the payments ceased suggests just the opposite.

Furthermore, we note that throughout its prosecution of this case, the Government itself treated the payments to investors as essential to Simmons's fraud.  The superseding indictment characterized the wire fraud offense as including transfers to "wire ponzi payment to investors and to their intermediaries in other States" -- the very transactions that the Government later prosecuted as money laundering.  And in its closing argument, the Government contended that payments to investors were necessary to the fraud because they "g[a]ve the investors confidence" that their investment was sound and "induce[d] them to put even more money back into the scheme." The Government explained that the payments were "one of the ways the defendant kept the scheme going."

In addition to the evidence proving that this particular Ponzi scheme relied on payments to early investors, such payments are understood to constitute essential features of Ponzi schemes.  In fact, we have defined a Ponzi scheme as one

18

"in which early investors are paid off with money received from later investors in order to prevent discovery and to encourage additional and larger investments." United States v. Loayza, 107 F.3d 257, 259 n.1 (4th Cir. 1997). The Oxford English Dictionary similarly defines a Ponzi scheme as a "form of fraud in which belief in the success of a non-existent enterprise is fostered by payment of quick returns to first investors using money invested by others." Ponzi Scheme, Oxford English Dictionary (2013).

Given these definitions, it is hardly surprising that the only other appellate court to decide a case involving a Ponzi-scheme operator convicted of both fraud and money laundering has reached the same conclusion as we do. In United States v. Van Alstyne, the Ninth Circuit reversed the defendant's money-laundering convictions on the ground that the payments of purported returns to early investors were "inherent" to the defendant's underlying scheme to defraud. 584 F.3d 803, 815 (9th Cir. 2009). The court concluded that the money-laundering convictions suffered from a merger problem because the very nature of a Ponzi scheme "require[s] some payments to investors for it to be at all successful." Id. at 815.

Finally, we note that when Congress amended the money-laundering statute in 2009 to include "gross receipts" within the law's definition of "proceeds," the Senate Report

19

acknowledged that Ponzi scheme payments could not be prosecuted as money laundering under the existing statute. The Report bluntly stated that, given the Santos Court's interpretation of the existing statute, the "proceeds of 'Ponzi schemes' like the Bernard Madoff case, which by their very nature do not include any profit, would be out of the reach of the money laundering statutes." S. Rep. No. 111-10, at 4 (2009). Of course, the Senate's interpretation of Supreme Court case law does not bind us. It does, however, accord with our conclusion that payments of purported returns to early investors are understood to constitute "essential expenses" of Ponzi schemes rather than transactions dispensing a Ponzi scheme's profits.

B.

The Government concedes that this case involves a "difficult line-drawing" issue, Gov't Br. at 57, but nonetheless contends that we must affirm. The Government raises three principal arguments as to why Simmons's money-laundering convictions present no merger problem.

First, the Government contends that Simmons's returns to investors constitute "the reinvestment of profit to finance future fraud" rather than "essential expenses" of an ongoing fraud. Gov't Br. at 56. Although the line between using criminal profits to finance a future fraud and using gross receipts to pay the expenses of an ongoing fraud is less than

20

self-evident, see Santos, 553 U.S. at 544 (Alito, J., dissenting), Santos both requires us to draw this line and offers useful guidance as to where the line falls in this case.

Santos's gambling scheme and Simmons's Ponzi scheme resemble each other in virtually all material respects. Both constituted ongoing schemes rather than discrete criminal transactions. The indictments in both cases charged underlying conduct that spanned a number of years rather than a single illegal act. And both schemes required occasional payments to third parties to sustain the crime during its lifespan.

Santos paid his lottery winners, presumably hoping that reliable paydays would induce winners, losers, and new players alike to test their luck during the next round of play. Of course, Santos could have declined to pay his winners and instead pocketed the cash. Had he done so, however, his gambling scheme would have been short-lived; it could not have lasted the six years charged in the indictment. A majority of the Supreme Court therefore agreed that Santos's payments to winners did not amount to the reinvestment of profit to finance new, discrete gambling crimes. Rather, these payments constituted expenses necessary to further a crime that, by its very nature, required periodic payments to survive.

The same is true in this case. Like a bookie who pays his winners in the hopes of attracting new and repeat gamblers

21

during the course of an ongoing lottery, Simmons paid early investors in the hopes of attracting new and repeat investors during the course of an ongoing fraud. Although Simmons could have absconded with the early investors' money before paying any returns, had he done so, his scheme certainly could not have lasted for the nearly three-year period charged in the indictment. See Santos, 553 U.S. at 520 n.7 (plurality opinion) (a criminal enterprise's profitability must be proved for "as long as the Government chooses to charge").

Given this case's similarity to Santos, we must decline the Government's invitation to divide Simmons's Ponzi scheme into a successive series of past, present, and future frauds. Rather, Santos requires that we hold that Simmons's Ponzi scheme, like the lottery scheme in Santos, represented a single, ongoing enterprise that the defendant could sustain only by making limited payouts.

The Government next argues that payments to innocent third parties -- rather than to coconspirators -- cannot constitute essential expenses of a criminal scheme. The Government notes that in both Cloud and Abdulwahab, the payments we deemed to be essential were made to the defendant's criminal accomplices rather than to innocent outsiders like Simmons's Ponzi victims. According to the Government, while paying one's accomplices is a typical expense of criminal activity akin to paying for a rented

22

getaway car, paying investors in order to maintain a Ponzi scheme is a different matter entirely.

This argument ignores the very facts of Santos itself. In Santos, payments to runners, collectors, and lottery winners formed the basis of the defendant's money-laundering convictions. 553 U.S. at 509. Although the runners and collectors were accomplices to Santos's crime, the lottery winners were not.[3] Manifestly, the Supreme Court therefore did not believe that the merger problem arises only when the defendant pays his co-conspirators or accomplices. See Santos, 553 U.S. at 515-16 (plurality opinion) ("Since few lotteries, if any, will not pay their winners, the statute criminalizing illegal lotteries would 'merge' with the money-laundering statute."). For our part, we have repeatedly explained in interpreting Santos that the essential nature of the payment -- rather than the identity of the payment's recipient -- dictates whether a given transaction raises a merger problem. See Cloud, 680 F.3d at 407; Halstead, 634 F.3d at 279.

---

[3] That these winners participated in an illegal lottery, and were therefore not strictly "innocent," did not make them accomplices to Santos's crime. The illegal gambling statute criminalizes "conduct[ing], financ[ing], manag[ing], supervis[ing], direct[ing], or own[ing]" a gambling operation that violates state law. 18 U.S.C. § 1955 (2006). The statute thus criminalizes the management of -- rather than the mere participation in -- an illegal gambling venture. Just like Simmons's victims, the lottery winners were therefore not participants or co-conspirators in Santos's crime.

23

Finally, perhaps recognizing the similarity between the payments in this case and those in Santos, the Government stretches to distinguish them by pointing to the assertedly unscheduled, discretionary nature of the Ponzi payments. The Government maintains that although regular payments to lottery winners -- as in Santos -- can constitute essential expenses of a criminal scheme, "payments in discretionary amounts made on no schedule in particular" -- assertedly as in this case -- cannot. Gov't Br. at 57.

It is not at all clear that the payments in Santos were more "scheduled" or less "discretionary" than those here.[4] But even assuming that Santos made payments according to a strict schedule, and that Simmons made them at whim, the Government raises a distinction without a difference. If a criminal scheme requires certain payments to succeed, it makes no difference whether these payments arrive regularly or sporadically. A payment need not be predictable to be essential. Because Simmons's Ponzi scheme depended on periodic payments to

---

[4] The payments here were governed by a contract permitting investors to withdraw funds on the first business day of each month. To be sure, Simmons failed to honor this contract. But his ultimate failure to honor his contractual obligations does not necessarily render the payments that he did make unscheduled. For its part, the Santos Court never specified whether Santos paid his winners on a particular schedule. In any event, in neither case can the payments be characterized as "discretionary" given that both schemes depended on the payments to survive.

24

investors, these payments constituted essential expenses of his criminal enterprise regardless of whether they accrued on a specified timetable.

IV.

Simmons's fraudulent scheme, like any typical Ponzi scheme, depended on attracting new investments through occasional payouts to existing investors. Without these payouts, there would have been no new investments and, consequently, no Ponzi scheme. The Government conceded -- indeed, trumpeted -- this fact throughout the trial proceedings -- both in its charging documents and its arguments to the jury. And Congress itself recognized as much when it amended the money-laundering statute in 2009 to ensure that Ponzi disbursements like the ones at issue here could henceforth be punishable as money laundering. Simmons's payments to investors, like Santos's payments to lottery winners, constitute essential expenses of his underlying fraud. Punishing Simmons separately for these payments therefore raises the same merger problem identified in Santos. For these reasons, while we affirm Simmons's two fraud convictions, we must reverse his two money-laundering

25

convictions, vacate his sentence, and remand for further proceedings consistent with this opinion.[5]

<u>AFFIRMED IN PART, REVERSED IN PART,</u>
<u>VACATED IN PART, AND REMANDED</u>

---

[5] We need not address Simmons's contention that his fifty-year sentence was procedurally and substantively unreasonable. And, given that Simmons's procedural challenge to his sentence rests on an asserted misapplication of a money-laundering sentence enhancement, this challenge should be moot on remand in light of our reversal of the money-laundering convictions on which it is based.

NIEMEYER, Circuit Judge, dissenting:

During the course of this Ponzi scheme, Simmons obtained money through wire fraud and securities fraud from investing customers and used a portion of the money so obtained -- the proceeds of the fraud -- to return $150,000 to James Bazluki and $16,000 to Till Lux in an effort to conceal the fraud he had committed on them. By so investing the proceeds of the fraud, Simmons was able to engage in additional fraud from which he obtained additional proceeds, because the payments to Bazluki and Lux deflected potential suspicion that otherwise might arise with respect to his initial fraudulent transactions.

Under these facts, when Simmons returned money to Bazluki and Lux, he engaged in "transactions" that constituted money laundering, in violation of 18 U.S.C. § 1956(a)(1)(A)(i) (prohibiting financial transactions involving the "proceeds of specific unlawful activity" (i.e., in this case, wire fraud and securities fraud)). And the fraud committed by Simmons in obtaining investors' money was a distinct, antecedent crime, completed when Simmons received the money. In these circumstances, I submit, the two crimes (money laundering and wire or securities fraud) did not merge so that Simmons was subjected to punishment twice for the same conduct. See United States v. Santos, 553 U.S. 507, 517 (2008) (observing that a "merger problem" would allow prosecutors, in their discretion,

27

to seek the higher penalty for the two merged crimes or both penalties); United States v. Halstead, 634 F.3d 270, 278-79 (4th Cir. 2011) (same).

Disagreeing with the majority's analysis, I would conclude that the payments to Bazluki and Lux were not the "essential expenses" of Simmons' wire fraud. See Santos, 553 U.S. at 528. The wire fraud did indeed have expenses in marketing and selling the scheme and paying employees to work the office. But once the fraudulent statements were made to customers and the customers sent money to Simmons based on the statements, the fraud was complete, and Simmons would then be punishable for violating the wire fraud statute, 18 U.S.C. § 1343. The subsequent payments back to the investors, who had earlier been defrauded, were not expenses of the fraudulent act -- they were not necessary as a matter of fact or law. Rather, they were acts of money-laundering that indeed would have the effect of covering up the fraud and thus promoting future frauds.

Our decision in United States v. Cloud, 680 F.3d 396 (4th Cir. 2012), makes clear the distinction between an expense of the fraud and a payment to conceal the fraud and promote future frauds. In Cloud, the proceeds of the fraud were paid to employed recruiters, as coconspirators of the defendant, who helped perpetuate the fraud. Id. at 408. We noted that the payments to these recruited coconspirators were the "essential

28

expenses of Cloud's underlying fraud, thus presenting a merger problem." Id. at 407. We thus found it essential that the payments be made to conspiring employees, distinguishing those payments from payments made to investors for cover-up and future frauds. As we stated:

> In utilizing monies from previous properties to finance future purchases, Cloud was not paying the "essential expenses" of the underlying crime.

Cloud, 680 F.3d at 408; see also United States v. Abdulwahab, 715 F.3d 521, 531 (4th Cir. 2013) (likewise holding that payments made to the defendant's agents for "services that played a critical role in the underlying fraud scheme" were essential expenses of the fraud and recognizing the distinction made in Cloud that payments to nonparticipating persons to promote future frauds were not "essential expenses").

In this case, Bazluki and Lux were not recruiters, confederates, or coconspirators in the fraudulent scheme. To the contrary, they were innocent victims of Simmons' wire or securities fraud, and the payments made to them were to cover up Simmons' past fraud and promote future fraud. Simmons' ability to obtain investments based on fraudulent statements subjected him to punishment under 18 U.S.C. § 1343, as well as 15 U.S.C. § 78j(b), and his payments of the fraudulently obtained monies to victims of the fraud were separate "transactions" that subjected him to punishment for money laundering under 18 U.S.C.

29

§ 1956(a)(1)(A)(i).  In this circumstance, there is no risk of penalizing Simmons twice for the same conduct.

The majority could only make its analysis work if Simmons were convicted of some single crime prohibiting a Ponzi scheme because under a Ponzi scheme, the proceeds from earlier fraudulent transactions are used to engage in future transactions.  But Simmons was not charged with a crime prohibiting a Ponzi scheme; he was charged with committing distinct crimes of wire fraud, securities fraud, and money laundering, and his payment of monies to investors who had already been defrauded was not an expense of the fraud; it was a transaction of money laundering.

Accordingly, I would not find that a merger problem exists in this case and would affirm on all counts.