RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 15a0235p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

UNITED STATES OF AMERICA,

　　　　　　　　　　　　*Plaintiff-Appellee,*

　　*v.*

RICHARD OLIVE,

　　　　　　　　　　　　*Defendant-Appellant.*

No. 13-6174

───────────────

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 3:12-cr-00048-1—Kevin H. Sharp, Chief District Judge.

Argued: November 18, 2014

Decided and Filed: September 22, 2015

Before: NORRIS, MOORE, and GIBBONS, Circuit Judges.

───────────────

**COUNSEL**

**ARGUED:** Robert H. Dietrick, Washington, D.C., for Appellant. Cecil W. VanDevender, UNITED STATES ATTORNEY'S OFFICE, Nashville, Tennessee, for Appellee. **ON BRIEF:** Robert H. Dietrick, Washington, D.C., for Appellant. Kathryn W. Booth, UNITED STATES ATTORNEY'S OFFICE, Nashville, Tennessee, for Appellee.

　　　NORRIS, J., delivered the opinion of the court in which GIBBONS, J., joined, and MOORE, J., joined in the result. MOORE, J. (pp. 17–27), delivered a separate opinion concurring in the judgment.

───────────────

**OPINION**

───────────────

　　　ALAN E. NORRIS, Circuit Judge. Defendant Richard Olive appeals his nine-count conviction for financial crimes committed while he served as President and Executive Director

1

of National Foundation of America ("NFOA"), a corporation organized in Tennessee. Specifically, a jury found him guilty of three counts of mail fraud in violation of 18 U.S.C. § 1341; four counts of wire fraud in violation of 18 U.S.C. § 1343; and two counts of money laundering, 18 U.S.C. § 1957. The district court sentenced him to 372 months of incarceration and three years of supervised release, and ordered him to pay restitution in the amount of $5,992,181.24.

On appeal, he challenges the sufficiency of the indictment, two evidentiary decisions made by the trial court, and three aspects of the sentencing calculation. He also argues that one of the money laundering counts should have been merged with the fraud counts.

**I.**

Because defendant challenges the sufficiency of the indictment, we begin by summarizing its allegations.

*The Indictment*

A grand jury returned a nine-count indictment on March 1, 2012. It alleged that defendant used NFOA in a scheme to defraud:

> Beginning in or about January 26, 2006 and continuing until in or about May 2007 . . . Richard Olive, and others known and unknown to the Grand Jury, devised and intended to devise a scheme and artifice to defraud annuitants and others, and to obtain money or property by means of materially false pretenses, representations, and promises, and by acts of concealment of the scheme, and in furtherance thereof, used the United States mail and interstate wires . . . .
>
> . . . .
>
> It was . . . part of the scheme that Richard Olive, through highly compensated insurance agents across the country, offered and sold investment contracts labeled as NFOA's "Installment Plan Agreement." Although Olive and the brokers did not generally refer to these as charitable gift annuities, the NFOA installment plans were marketed as offering similar features and benefits. Potential customers could purchase an installment plan with either cash or by transferring existing annuities, real estate, or securities to NFOA. The vast majority of NFOA's customers were persons who owned an existing annuity.

The indictment further charged that defendant made other misrepresentations: in February 2006, he told an insurance agent that NFOA had been in business for several years and had significant

assets; he stated that NFOA had been recognized as a non-profit charitable foundation pursuant to Section 501(c)(3) of the tax code when, in fact, defendant had merely applied for tax-exempt status, an application that was ultimately denied in February 2008; and, finally, he and the brokers with whom he worked failed to inform customers that NFOA was operating despite cease-and-desist orders issued by several states.

Once customers transferred their annuities to NFOA, defendant would typically surrender them, thereby triggering financial penalties and reducing the value of the annuity. Although defendant guaranteed his customers fixed payments under an NFOA installment plan, the reality was different:

> Olive knew that NFOA paid its brokers commissions well above the industry rate, lost a significant portion of the obtained annuities' value due to their early surrender, and diverted a portion of funds to Olive's and others' personal benefit. Because of those costs and the lost value of the annuities, Olive knew that NFOA had far too few assets under its control to guarantee the income in the amounts promised.

Having outlined the scheme to defraud, the indictment then detailed the specific instances of mail and wire fraud. With respect to the money laundering counts, the indictment alleged that defendant withdrew $641,051.17 from NFOA on April 4, 2007 in order to purchase a Las Vegas condominium (Count 8) and used NFOA funds to pay an insurance agent $30,028.33 (Count 9).

*Trial Testimony*

Defendant founded NFOA in January 2006 and applied to the IRS for recognition of its Section 501(c)(3) status the same month. He learned the "business model" from his tenure as a development advisor and executive at National Community Foundation, which offered products similar to those later marketed by NFOA. The company purported to be a charitable organization that supported humanitarian services. As mentioned in the indictment, NFOA encouraged financial advisors[1] to sell its products by offering a 9% commission, which exceeded the industry average.

---

[1]The briefs and record refer to brokers, insurance agents, and financial advisors interchangeably.

Two months after its founding, NFOA had three employees: defendant, his wife Susan, and Kenny Marks, who wrote promotional materials for the company, including video scripts. After its first year, it had five employees: Richard and Susan Olive, David Vincent, and defendant's two stepdaughters, Breanna Galatte and Jenilee Vander Elst. Defendant's wife worked in the office and also did marketing. Vander Elst served as a receptionist. The company primarily drummed up business through mailings to financial advisors. Gallatte and Vincent fielded calls from them, explaining the ins and outs of their products. To do so, Vincent and Gallate relied upon a software program and script developed by defendant and his wife. According to Gallatte's testimony, she and Vincent were told not to deviate from the script when talking to financial advisors. Among the things included in the script was an assertion that NFOA was a tax-exempt Section 501(c)(3) organization. If a financial advisor's questions went beyond the scope of the script, he or she was referred to defendant.

As discussed earlier, NFOA's primary business was exchanging a customer's existing annuity for one of the company's installment plans, which promised higher returns. Annuities typically have an accumulated value and a surrender value. If surrendered early, the owner receives a substantially lower cash payout. Defendant typically surrendered annuities that it received from customers early. Over the course of its existence, NFOA completed contracts that exchanged client annuities worth approximately $19.3 million and surrendered them for $16.5 million.

On January 17 and March 7, 2007, the IRS contacted NFOA asking for additional information related to its application for Section 501(c)(3) status. The company retained an attorney, David Kamer, who advised defendant that NFOA should not be represented as being a 501(c)(3) enterprise when its application was still pending. Rather, he recommended that the company inform its clients of the situation and note the adverse tax consequences that would attend a denial of 501(c)(3) status. Despite this advice, defendant told others, including financial advisors, that a determination letter was not required for clients to recognize a charitable deduction.

As time passed, NFOA purchased real property with a portion of its assets. These properties included a Jiffy Lube franchise in Georgia, land in Tennessee that included a cell

phone tower, an office condominium in Franklin, Tennessee, and a condominium in Las Vegas, Nevada.  The last of these transactions forms the basis of a money laundering charge (Count 8). The Las Vegas condominium was purchased for the defendant's family vacations and to entertain financial advisors.  However, it was never used for this purpose because the State of Tennessee took control of NFOA on May 24, 2007, after determining that it was undercapitalized.

At trial, the district court admitted into evidence cease-and-desist orders issued against NFOA by several states, as long as they were in effect during the time period covered by the indictment.  Orders were admitted from the states of Washington, Texas, Iowa, Florida, Alabama, Kansas, California, and Michigan.  The orders alleged that NFOA was operating illegally because it was not licensed to sell insurance and/or was unlawfully selling securities. They also charged that NFOA incorrectly claimed that it enjoyed tax-exempt status under Section 501(c)(3).  Financial advisors testified that knowledge of the orders would have affected their willingness to market NFOA products.

## II.

We now turn to the issues raised by defendant, beginning with the sufficiency of the indictment.

### A.  *Sufficiency of the Indictment*

As a general proposition, this court reviews the sufficiency of an indictment de novo. *United States v. Gibson*, 409 F.3d 325, 331 (6th Cir. 2005).  Pursuant to Federal Rule of Criminal Procedure 34, the trial court must arrest judgment if the indictment does not charge an offense.  Fed. R. Crim. P. 34(a).  However, where, as here, "a challenge to an indictment is brought for the first time after the defendant has been convicted, the indictment is 'construed liberally in favor of its sufficiency.'" *Gibson*, 409 F.3d at 331 (quoting *United States v. Gibson*, 513 F.2d 978, 979 (6th Cir. 1975)); *see also United States v. Lloyd*, 462 F.3d 510, 513 (6th Cir. 2006) ("Where an indictment goes unchallenged until appeal, . . . a conviction must not be reversed unless the indictment cannot be reasonably construed to charge a crime.") (citing *United States v. Gatewood*, 173 F.3d 983, 986 (6th Cir. 1999)).

Prior to trial, defendant filed a motion styled, "Motion to Dismiss or Strike the False Statements Alleged in Paragraph 9(b), 9(c), and 10 of the Indictment." The three passages under attack all averred that defendant had falsely represented to annuitants and potential customers, as well as to administrators of existing annuities, that NFOA was a tax-exempt foundation.

The district court noted that "both the introductory and concluding paragraphs [of his motion] indicate that Defendant is moving to dismiss or strike certain language in the Indictment, not the entire Indictment itself." *United States v. Olive*, No. 3:12-00048, 2012 WL 4757865, at *1 (M.D. Tenn. Oct. 5, 2012). The court went on to conclude that "even without the challenged language, sufficient factual allegations exist to support the charges of mail fraud, wire fraud, and money laundering, and Defendant makes no argument supporting dismissal of the Indictment." *Id.* With respect to the language challenged, the court summarized defendant's argument, which he renews on appeal, that it was unclear whether merely applying for tax-exempt status was enough to confer such status pending a contrary conclusion on the merits by the IRS. In denying the motion, the district court observed: "Defendant's premise—that NFOA was, in fact, a charitable organization—may prove to be wrong, and is something for the jury to determine." *Id.* at *3.

As he did below, defendant points to authority cited by attorney David Kamer who testified that an opinion letter issued by the General Counsel of the IRS supported defendant's position that an application for Section 501(c)(3) certification is—at least temporarily—enough to confer tax-exempt status. Kamer testified that he "told [NFOA's potential clients] that they could take a deduction; but if the IRS issued a determination that it didn't find the organization to be a 501(c)(3) organization, then they would have to amend the[ir] returns." In defendant's view, the ambiguity surrounding the question supported his good faith belief that representing NFOA as a Section 501(c)(3) was legal.

He also directs us to the Tennessee statute governing charitable organizations, which provides in part as follows:

> Any organization which has applied for but not received a determination of tax exempt status shall file a copy of the completed application which has been submitted to the internal revenue service, and any letters received from the internal revenue service acknowledging receipt of the application.

Tenn. Code Ann. § 48-101-504(e).  In defendant's view, this provision supports the opinion of the General Counsel of the IRS cited above to the effect that the application temporarily triggers tax-exempt status.

An indictment is sufficient if it contains the elements of the charged offense and thereby informs the defendant of the charges against him.  It must also be specific enough to allow him to plead an acquittal or conviction as a bar to future prosecutions for the same offense. *United States v. Anderson*, 605 F.3d 404, 411 (6th Cir. 2010) (citing *Hamling v. United States*, 418 U.S. 87, 117 (1974)).  In this case, wire fraud requires the proof of three elements beyond a reasonable doubt: 1) defendant devised or willfully participated in a scheme to defraud; 2) he used an interstate wire communication to further the scheme; and 3) he intended to deprive someone of money or property.  *United States v. Cunningham*, 679 F.3d 355, 370 (6th Cir. 2012) (citation omitted).  Mail fraud has essentially the same elements except that the use of the mails rather than a wire is required.  *United States v. Kennedy*, 714 F.3d 951, 958 (6th Cir. 2013).

With that in mind, we note that the indictment alleged that defendant made many misrepresentations in addition to his claim that NFOA enjoyed Section 501(c)(3) tax-exempt status.  These included the following: he misrepresented to an insurance agent that NFOA had been in business for several years; he provided fraudulent financial statements from 2003 and 2004 despite the fact that NFOA was formed in 2006; he failed to inform clients and financial advisors that NFOA was subject to cease-and-desist orders in several states; and he falsely represented to annuitants that they would receive "a series of guaranteed fixed payments" despite knowing that NFOA "had far too few assets under its control to guarantee the income in the amounts promised."  These allegations led the district court to observe, "[I]nsofar as Defendant's motion could be construed as a request for dismissal, the same will be denied because, even without the challenged language, sufficient factual allegations exist to support the charges of mail fraud, wire fraud, and money laundering, and Defendant makes no argument supporting the dismissal of the Indictment."  *Olive*, 2012 WL 4757865, at *1.

We agree with the district court that the indictment was sufficient.  First, defendant did not move to dismiss the indictment for lack of sufficiency at trial and we therefore construe it liberally.  Second, it contained several allegations of fraudulent misrepresentations, not simply

ones that misrepresented NFOA's Section 501(c)(3) status.  Third, defendant is actually attacking the truth of the indictment's allegations concerning the Section 501(c)(3) status of NFOA.  Such a challenge does not go to the sufficiency of the indictment.  Rather, the indictment's charges put defendant on notice about what he needed to defend against, and enabled him to do just that at trial.

*B. Evidentiary Issues*

As mentioned at the outset, pursuant to Federal Rule of Evidence 404(b), the district court permitted the introduction of cease-and-desist orders issued by several states demanding that NFOA cease selling its installment plans.

We review a district court's evidentiary rulings for an abuse of discretion.  *United States v. Bell*, 516 F.3d 432, 440 (6th Cir. 2008).  Rule 404(b) permits a district court to admit evidence of other "crimes, wrongs, or other acts" as long as the evidence is offered for a purpose, "such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident,"  and not for the mere purpose of proving the defendant's bad character. *See* Fed. R. Evid. 404(b)(2).  We use the following test when reviewing the admission of 404(b) material:

> [W]e employ a three-part test, reviewing (1) for clear error the district court's determination that the "other act" took place; (2) *de novo* the district court's legal determination that the evidence was admissible for a proper purpose; and (3) for abuse of discretion the district court's determination that the probative value of the other acts evidence is not substantially outweighed by its unfairly prejudicial effect.

*Bell*, 516 F.3d at 440 (quoting *United States v. Ayoub*, 498 F.3d 532, 547 (6th Cir. 2007)).

The district court began its discussion by characterizing the orders at issue:

> Each Cease and Desist Order contained allegations that NFOA was operating illegally within the state of issuance because it was not licensed to sell insurance and/or was unlawfully selling securities.  The Orders also contained allegations that NFOA wrongfully claimed it had charitable exempt status under Section 501(c) of the Internal Revenue Code.

*United States v. Olive*, No. 3:12-00048, 2012 WL 5866138, at *5 (M.D. Tenn. Nov. 19, 2012). The district court reasoned that the failure by defendant to disclose the existence of such orders "suggests knowledge and intent" on his part. However, the court recognized that the admission of Rule 404(b) material must be balanced with possible prejudice. For that reason, the court limited the admission of the cease-and-desist orders to the following:

> The Court will . . . allow the Government to present evidence that NFOA and Defendant were issued Cease and Desist Orders that they did not disclose, and which alleged that NFOA was wrongfully claiming that it had received Section 501(c) exempt status. Such evidence will be limited to the Cease and Desist Orders that were issued while Defendant was still operating NFOA, and does not include the Cease and Desist Orders that were issued by Kansas, California and Michigan, after Tennessee took over operation of NFOA.

*Id.* at *6. However, it precluded the government from using the orders to prove that defendant had violated state securities and insurance laws. *Id.*

Defendant contends that even the district court's limited admission of the orders at issue was unduly prejudicial because the state regulatory conclusions concerning NFOA's 501(c)(3) status were baseless, unduly prejudicial, and caused undue confusion. Specifically, he points out that the IRS issued two requests for additional information to NFOA in support of its application for tax-exempt status while the orders were in effect. It follows, he argues, that because the states issuing the orders had no authority to make a Section 501(c) determination, introducing the orders was unfairly prejudicial because they implied that, in fact, the states had such authority.

For its part, the government directs us to a prior case, United States v. Gold Unlimited, Inc., 177 F.3d 472, 487 (6th Cir. 1999), in which we allowed the introduction of cease-and-desist orders a judicial opinion, and a complaint from six states, in total as probative of knowledge, plan, and intent. In that case, defendants had been charged with mail fraud and money laundering in connection with a pyramid scheme. Second, the government observes that the indictment in the present case charged defendant with failure to inform its potential clients and brokers of these orders. At least three brokers testified that they would not have sold NFOA products had they known of these orders, making them relevant and admissible for a proper purpose. Even if they were not admissible on that basis, they were pursuant to Rule 404(b) because they showed knowledge, intent, and lack of mistake by demonstrating that defendant

was on notice that he was misrepresenting NFOA's tax-exempt status. Third, with respect to defendant's argument that the orders were misleading because the states issuing them did not have the authority to make a Section 501(c)(3) determination, the government responds that the cease-and-desist orders are probative not because the states had the ability to make the determination whether NFOA received such status, but because they put Olive on notice that he was making this misrepresentation.

In our view, admission of the cease-and-desist orders did not constitute an abuse of discretion. While it is true that the states issuing them lacked the authority to grant Section 501(c)(3) status, they were not admitted for the purpose of proving that NFOA was not tax-exempt. Rather, they were introduced to show that defendant was aware of the fact that tax-exempt status was, at the very least, in doubt. His decision not to divulge them to his prospective clients and financial advisors is probative of his knowledge and intent. As the testimony of three financial advisors during trial indicated, they would have made different business decisions with respect to NFOA had they known about the orders.

A second evidentiary issue raised by defendant involved a charitable donation he and his wife claimed when they filed their joint 2006 tax return. That return included a $25,000 charitable deduction based upon contributions to NFOA. On July 16, 2008, long after NFOA had been taken over by the State of Tennessee, the IRS sent them a letter asking for further information about the gift. They complied by sending, among other things, copies of two checks for $20,000 and $5,000 payable to NFOA as donations. In a letter dated October 6, 2008, the IRS informed the couple that "[w]e are pleased to tell you that we did not make any changes to the tax reported on your return."

At trial, defense counsel informed the court that he wished to introduce this "no change" letter as evidence that defendant properly thought that donors could take a tax deduction made to entities, such as NFOA, which had filed for Section 501(c)(3) status but had not yet received a determination letter. As counsel put it, "The centerpiece of his defense is that he believed, based on [Section] 508 [of the tax code] and his discussions with the IRS . . . , that once the 501(c)(3) application was filed, the tax deductions could be taken even if there was an unfavorable determination."

In response, the district court asked: "[W]hat do we care what the IRS did in 2008?" Defense counsel continued to urge the court to realize that the IRS, by allowing the deduction, was confirming defendant's belief and thereby undermining any proof of intent to defraud based upon a misrepresentation of NFOA's Section 501(c) status. The district court elected not to allow this evidence to be introduced.

Our determination of this issue is governed by our standard of review. While defendant asserts that he honestly believed that he was entitled to a charitable deduction in 2006 and that his instinct was confirmed by the IRS no change letter, it is apparent that the letter did not address the validity of NFOA's Section 501(c) application and is therefore is of limited evidentiary value. The district court's decision to exclude it based upon lack of relevance does not amount to an abuse of discretion.

### C. *Whether One of the Money Laundering Counts Should have Merged*

As mentioned at the outset, defendant was convicted of two counts of money laundering in violation of 18 U.S.C. § 1957, which prohibits "knowingly engag[ing] or attempt[ing] to engage in a monetary transaction in criminally derived property of a value greater than $10,000 . . . derived from specified unlawful activity." 18 U.S.C. § 1957(a). One of these, Count 9, charged him with using criminally derived NFOA funds to pay an insurance agent a commission of $30,028.33. While he did not raise the issue at trial, defendant now contends that *United States v. Santos*, 553 U.S. 507 (2008), precludes this conviction. In *Santos*[2] the Court was asked to determine whether "proceeds," as used in 18 U.S.C. § 1956, refers to "receipts" of a criminal enterprise or to "profits" derived therefrom. *Id.* at 509. A plurality concluded that proceeds means profits in the context of 18 U.S.C. § 1956 (and by extension, § 1957, which is at issue in this case)[3]: "Because the 'profits' definition of 'proceeds' is always more defendant-friendly than the 'receipts' definition, the rule of lenity dictates that it should be adopted." *Id.* at 514. In *Santos*, the defendant was charged with laundering money derived from

---

[2]Although decided after the scheme to defraud in this case occurred, we have held that *Santos* applies retroactively. *Wooten v. Cauley*, 677 F.3d 303, 308-09 (6th Cir. 2012).

an illegal lottery scheme.  In reaching its conclusion, the plurality explained why the profits definition complied more nearly with the rule of lenity:

> If "proceeds" meant "receipts," nearly every violation of the illegal-lottery statute would also be a violation of the money-laundering statute, because paying a winning bettor is a transaction involving receipts that the defendant intends to promote the carrying on of the lottery.  Since few lotteries, if any, will not pay their winners, the statute criminalizing illegal lotteries, 18 U.S.C. § 1955, would "merge" with the money-laundering statute. . . .
>
> The merger problem is not limited to lottery operators.  For a host of predicate crimes, merger would depend on the manner and timing of payment for the expenses associated with the commission of the crime. . . . Generally speaking, any specified unlawful activity, an episode of which includes transactions which are not elements of the offense and in which a participant passes receipts on to someone else, would merge with money laundering. . . .
>
> . . . Interpreting "proceeds" to mean "profits" eliminates the merger problem.

*Id.* at 515-17.

This circuit has addressed the holding of *Santos* on several occasions.  *See, e.g., Kratt*, 579 F.3d at 560-63; *United States v. Crogrove*, 637 F.3d 646, 654-55 (6th Cir. 2011); *Jamieson v. United States*, 692 F.3d 435, 439-40 (6th Cir. 2012).  As Justice Scalia recognized, his plurality opinion is limited by the narrower reasoning of Justice Stevens' concurrence, which supplied the critical fifth vote.  *Santos*, 553 U.S. at 523.  While this court has struggled to parse the precise holding of *Santos*, *see Kratt*, 579 F.3d at 562, we have construed it to implicate three considerations:

> (1) is there a merger problem; (2) does this problem lead to a radical increase in the statutory maximum sentence; and (3) does the legislative history fail to show that Congress intended the increase? If the answer to *all three* questions is yes, "proceeds" means "profits." If the answer to any question is no, then "proceeds" means "gross receipts." *See United States v. Crosgrove*, 637 F.3d 646, 654–56 (6th Cir. 2011) (explaining and applying the "*Santos–Kratt* framework").

*Jamieson*, 692 F.3d at 440 (emphasis original).  With these steps in mind, we turn to each of them.

---

[3]We have specifically held that "proceeds" has the same meaning in §§ 1956 and 1957.  *United States v. Kratt*, 579 F.3d 558, 560-61 (6th Cir. 2009); *see also* 18 U.S.C. § 1957(f)(3).

Is there a merger problem?  We conclude that there was.  The mail fraud counts of the indictment charge that defendant "through highly compensated insurance agents across the country, offered and sold investment contracts labeled as NFOA's 'Installment Plan Agreement.'"  The money laundering count at issue charges defendant with "the transfer and withdrawal of funds by the means set forth below, such property having been derived from a specified unlawful activity, namely, mail fraud."  While the government argues that money laundering occurred after the completion of the mail fraud offense, the criminal acts charged in the indictment lead us to an opposite conclusion: the mail fraud included compensating "insurance agents across the country."  NFOA made (or lost) money by inducing insurance agents to purchase installment plans.  And, "[a]n individual cannot be convicted of money laundering for paying the 'essential expenses of operating' the underlying crime." *United States v. Halstead*, 634 F.3d 270, 279 (4th Cir. 2011) (quoting *Santos*, 553 U.S. at 528 (Stevens, J., concurring)).  We therefore conclude that there is a "merger problem" in this case.

However, even though we conclude that a merger problem exists, defendant must also be exposed "to a markedly increased statutory maximum." *Kratt*, 579 F.3d at 563.  In this case, the statutory maximum sentence for mail fraud, 18 U.S.C. § 1341, is twenty years' while the maximum for money laundering under 18 U.S.C. § 1957 is ten.  In *Kratt*, the money laundering offense carried a lesser penalty than the predicate offense, and that factor ended the inquiry.  Is the instant case distinguishable?  We note that the district court imposed consecutive sentences totaling 31 years of imprisonment, certainly above the statutory maximum of both the mail fraud and money laundering statutes (but below the Guidelines range of 106 years').  Should the fact that the sentences were to run consecutively matter as long as the predicate offense of the merged counts carries a greater statutory maximum?  We think not.  While defendant has received a very lengthy sentence, the additional five years occasioned by the money laundering conviction at issue does not implicate the rationale of *Santos* or our cases construing it, to wit, that a money laundering conviction which embraces the same criminal behavior as the predicate offense must also raise the statutory maximum sentence for defendant to win relief.  Given that the *Santos* inquiry is one of statutory construction, it makes little sense to hinge the meaning of "proceeds" on a discretionary post-conviction sentencing decision.  Both the court and the parties are

entitled to know its definition with certainty throughout the proceedings because the definition will affect charging decisions, plea negotiations, trial strategy, and jury instructions.

Finally, because we deny defendant relief on the second factor, "there is no reason to consider whether the legislative history shows that Congress contemplated, and intended, any such outcome." *Kratt*, 579 F.3d at 563.

### D. Sentencing Issues

Defendant objects to three sentencing decisions: the amount of loss calculation; his role in the offense; and the "vulnerable victim" enhancement. The 2012 version of the Sentencing Guidelines was used in this case.

### 1. Amount of Loss Calculation

Pursuant to U.S.S.G. § 2B1.1(b)(1)(L), the presentence report ("PSR") recommended that defendant's base offense level be increased by 22 because the amount of loss was between $20 and $50 million. The district court disagreed and fixed the amount of loss at more than $2.5 million but less than $7 million, for an enhancement of 18. *See* U.S.S.G. § 2B1.1(b)(1)(J). Despite the more favorable calculation, defendant objects because the district court failed to provide sufficient rationale for its decision. At the sentencing hearing, the court gave this explanation:

> Based on the evidence, I think that it's J that applies. It's greater than 2.5 million. I think the evidence was more than sufficient for the application of that loss amount. And so there is an 18 point enhancement.

Counsel failed to object or ask for clarification and hence our review is for plain error. *United States v. Vonner*, 516 F.3d 382, 385-86 (6th Cir. 2008) (en banc).

The district court "need only make a reasonable estimate of the loss." U.S.S.G. § 2B1.1 cmt. n.3(C). That determination is entitled to "appropriate deference." *Id.* We note that the district court ordered restitution in the amount of $5,992,181.24, which was less than the amount sought by the government. Given that figure, we may infer that the court used it to determine the Guidelines' loss amount as well. Of course, more explanation would have been helpful but, in the light of our plain error review, we affirm the district court on this point.

2.  Role in the Offense

The district court enhanced defendant's offense level by four because it concluded that he "was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive."  U.S.S.G. § 3B1.1(a).  The court observed, "No question he was the leader of this criminal activity, such that the four-level enhancement applied."  We review the factual findings of the district court on this issue for clear error and accord deference to the legal conclusion that a person is an organizer or leader under Section 3B1.1.  *United States v. Washington*, 715 F.3d 975, 982-83 (6th Cir. 2013).

> An application note to the guideline at issue provides as follows:
>
> In assessing whether an organization is "otherwise extensive," all persons involved during the course of the entire offense are to be considered. Thus, a fraud that involved only three participants but used the unknowing services of many outsiders could be considered extensive.

U.S.S.G. § 3B1.1, cmt. n.3.  If the district court finds that the defendant directed someone else and the scheme to defraud was otherwise extensive, then it can apply the enhancement without singling out five individuals.  *See United States v. Anthony*, 280 F.3d 684, 699 (6th Cir. 2002) (explaining that "if the offense involved fewer than five participants the 'otherwise extensive' language on which the sentencing court may base its decision to depart upward", provided "the offense, in question is somehow the functional equivalent of a crime involving five or more participants.")  In this case, the scheme was quite extensive inasmuch as it involved the "unknowing services of many outsiders":  the many financial advisors who supplied "clients" for defendant to defraud.  We affirm on this basis.

3.  Vulnerable Victims

The Guidelines call for a two-level enhancement if the "defendant knew or should have known that a victim of the offense was a vulnerable victim."  U.S.S.G. § 3A1.1(b)(1).  A vulnerable victim is someone who "is unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct."  U.S.S.G. § 3A1.1, cmt. n.2.  The PSR recommended the enhancement because most of the annuitant victims were elderly with an average age of 77.  The district court did not offer much further

explanation, observing only that, "[D]efendant knew or should have known that the victims of the offense were vulnerable, more than sufficient evidence of that."

Defense counsel argues that the financial advisors were the ones who selected the clients, not defendant, and that they were sophisticated people of means because they employed financial advisors in the first place. Given the age of the victims, the fact that no financial advisor was charged with malfeasance, and our standard of review, we affirm this enhancement.

## III.

The judgment of the district court is **affirmed**.

---

**CONCURRING IN THE JUDGMENT**

---

KAREN NELSON MOORE, Circuit Judge, concurring in the judgment only.  I must concur with the majority's conclusion that Olive's money-laundering conviction (Count 9), 18 U.S.C. § 1957 (2006),[1] did not merge with his mail- and wire-fraud convictions because I am bound by this court's prior published opinions, *United States v. Kratt*, 579 F.3d 558, 560 (6th Cir. 2009), and *Jamieson v. United States*, 692 F.3d 435, 440 (6th Cir. 2012) (per curiam) (holding that mail fraud and money laundering do not merge).  I do not believe, however, that this is the correct result under *United States v. Santos*, 553 U.S. 507 (2008).  I conclude that *Kratt*'s holding—that "proceeds" "means profits only when the § 1956 predicate offense creates a merger problem that leads to a radical increase in the statutory maximum sentence and only when nothing in the legislative history suggests that Congress intended such an increase"—was wrong.  579 F.3d at 562.  In particular, the focus on whether the § 1957 offense "radical[ly] increase[s] . . . the statutory maximum sentence," *id.*, is an inaccurate characterization of the holding of *Santos*.  The appropriate application of *Santos* requires vacating Olive's sentence and remanding the case to the district court for resentencing, but as long as *Kratt* remains the law of this circuit, I must join the majority's judgment.

Olive contends that there is insufficient evidence in the record to uphold his conviction for money laundering in violation of § 1957 because the government did not prove that he used the profits—rather than gross receipts—of his mail-fraud scheme in order to pay Anthony Heuermann, a financial advisor, a commission for referring one of his clients to NFOA.[2]

---

[1]In 2009, Congress amended 18 U.S.C. § 1956 to define "proceeds" as "any property derived from or obtained or retained, directly or indirectly, through some form of unlawful activity, including the gross receipts of such activity." 18 U.S.C. § 1956(c)(9) (2012). Apparently, Congress intended the "perverse result" that troubled six of the Justices in *Santos*. Because Olive's conduct occurred before May 20, 2009, however, the former statutory language of 18 U.S.C. § 1956 and § 1957 applies. *United States v. Rubashkin*, 655 F.3d 849, 864 n.3 (8th Cir. 2011).

[2]The precise nature of Olive's claim is a little unclear. On the one hand, he argues that "the evidence presented at trial [established that] the commission payment to Mr. Heuermann is encompassed by the conduct charged in Count 2 and [is] merely . . . commission payments made to each financial advisor who completed a sale of a NFOA product to one of their clients." Appellant Br. at 27. The government contends that Olive has asserted that there was a double-jeopardy error. Appellee Br. at 43–44. In reply, Olive clarified his argument; he explained

Appellant Br. at 27. Olive argues that the commission payments were "essential expenses of operating" the mail-fraud scheme, and therefore his convictions for mail fraud and money laundering "merge." *Santos*, 553 U.S. at 527–28 (Stevens, J., concurring).

Olive concedes that he did not argue in the district court that his money-laundering conviction merged with the mail-fraud conviction, and therefore we must review his claim for plain error. Appellant Reply Br. at 15 (citing *United States v. Crosgrove*, 637 F.3d 646, 656 (6th Cir. 2011)). We may reverse Olive's money-laundering conviction if (1) the government was required to prove as a matter of law that Olive used the profits of his fraud scheme to pay commissions, which it did not do; (2) the error was plain; (3) the error affects Olive's substantial rights; and (4) the error "seriously affects the fairness, integrity or public reputation of the judicial proceedings." *Crosgrove*, 637 F.3d at 656.

18 U.S.C. § 1957(a) prohibits "knowingly engag[ing] or attempt[ing] to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity." Wire fraud is among the numerous predicate offenses. *See id.* § 1957(f)(3) ("[T]he term[] 'specified unlawful activity' . . . shall have the meaning given [that] term[] in section 1956 of this title."); *id.* § 1956(c)(7)(A) ("[T]he term 'specified unlawful activity' means . . . any act or activity constituting an offense listed in section 1961(1) of this title . . . ."); *id.* § 1961(1) (listing mail fraud, 18 U.S.C. § 1341). "[T]he term 'criminally derived property' means any property constituting or derived from, proceeds obtained from a criminal offense . . . ." *Id.* § 1957(f)(2).

In *Santos*, the Supreme Court attempted to define the term "proceeds" within the meaning of § 1956, 553 U.S. at 510–11 (plurality), which has the same meaning under § 1957. *Kratt*, 579 F.3d at 560. "'Proceeds' can mean either 'receipts' or 'profits,'" and thus the Court concluded that the term was inherently ambiguous. *Santos*, 553 U.S. at 511 (plurality). The Court considered whether the context of the money-laundering statute clarified the meaning of

---

that, under *Santos*, the government could not punish him "twice for two separate offenses if the conduct underlying one offense (money laundering) was necessary to the conduct underlying another (specified criminal activity)." Appellant Reply Br. at 15 n.3. Thus, Olive contends that the government had to prove that Olive paid Heuermann with the profits of his fraud scheme, which it did not, and therefore the money-laundering and fraud counts are duplicative. *Id.* Both Olive and the government agree that Olive has alleged a legal error and that this court is limited to plain-error review. Appellee Br. at 43–44; Appellant Reply Br. at 15.

the term "proceeds," but four of the Justices believed that it did not. *See id.* at 513–14. Because the term "proceeds" remained ambiguous even when read in the context of the whole statute, four Justices concluded that the rule of lenity requires reading "proceeds" to mean "profits"—the "more defendant-friendly" meaning of "proceeds" because "[f]ew crimes are entirely free of cost[,] . . . [a]nd any wealth-acquiring crime with multiple participants would become money laundering when the initial recipient of the wealth gives his confederates their shares." *Id.* at 514, 516. According to the plurality, "the felon who uses the stolen money to pay for the rented getaway car . . . would violate the money-laundering statute." *Id.* at 516.

Justice Alito wrote the dissent signed by three additional Justices, arguing that the term "proceeds" must mean "gross receipts" for every predicate offense. *See id.* at 531–49. Justice Breyer joined the dissent, but wrote separately to emphasize that he, too, observed and was troubled by "the 'merger' problem" because he found it "difficult to understand why Congress would have intended the Government to possess this punishment-transforming power." *Id.* at 529–31. Justice Breyer believed that there were other legal avenues to mitigate the unfairness of "the 'merger' problem," which he believed "is essentially a problem of fairness in sentencing," which the Sentencing Commission could solve by crafting appropriate Sentencing Guidelines. *Id.*

Justice Stevens concurred in the judgment, and thus no opinion garnered a majority of the Justices' votes. "[T]he 'position taken by those [Justices] who concurred in the judgment[] on the narrowest grounds' represents its holding," *Kratt*, 579 F.3d at 562 (quoting *Marks v. United States*, 430 U.S. 188, 193 (1977)), and therefore Justice Stevens's concurring opinion represents the holding of *Santos*, 553 U.S. at 523 (plurality). He believed that "proceeds" could mean "gross receipts" with respect to some, but not all predicate offenses. *Id.* at 526 (Stevens, J., concurring in the judgment). For example, Justice Stevens concluded that Congress had demonstrated its intent to criminalize the use of gross receipts generated by "the sale of contraband and the operation of organized crime syndicates involving such sales." *Id.* at 526 (Stevens, J., concurring in the judgment). He acknowledged, however, that the legislative history for those two predicate offenses "shed[] no light on how to identify proceeds under" the other predicate offenses. *Id.* And "[t]he consequences of applying a 'gross receipts' definition

of 'proceeds' to" certain predicate offenses were "so perverse that" Justice Stevens could not "believe they were contemplated by Congress." *Id.* This "perverse" result was "[a]llowing the Government to treat the mere payment of the expense of operating an illegal gambling business as a separate offense," which "is in practical effect tantamount to double jeopardy." *Id.* at 527. According to Justice Strevens, absent an "explanation for why Congress would have wanted a transaction that is a normal part of a crime it had duly considered and appropriately punished elsewhere in the Criminal Code to radically increase the sentence for that crime,'" the rule of lenity required defining "proceeds" as "profits." *Id.* at 528 (quoting plurality, *id.* at 517).

The *Santos* plurality, except Justice Thomas, offered their own interpretation of Justice Stevens's narrow holding: "'[P]roceeds' means 'profits' when there is no legislative history to the contrary." *Santos*, 553 U.S. at 523 (plurality). Justice Stevens disagreed with the plurality's characterization of the holding and attempted to clarify his reasoning:

> In what can only be characterized as the "purest of dicta," the plurality speculates about the *stare decisis* effect of our judgment and interprets my conclusion as resting on the ground that " 'proceeds' means 'profits' when there is no legislative history to the contrary." . . . That is not correct; my conclusion rests on my conviction that Congress could not have intended the perverse result that the dissent's rule would produce if its definition of "proceeds" were applied to the operation of an unlicensed gambling business. In other applications of the statute not involving such a perverse result, I would presume that the legislative history summarized by JUSTICE ALITO reflects the intent of the enacting Congress.

*Id.* at 528 n.7 (Stevens, J., concurring in the judgment) (citation omitted). The "perverse result" that troubled the plurality, Justice Stevens, and Justice Breyer was "[a]llowing the Government to treat the mere payment of the expense of operating [the] illegal business . . . as a separate offense," which "is in practical effect tantamount to double jeopardy." *Id.* at 527 (Stevens, J., concurring in the judgment). In other words, Justice Stevens was concerned about "the merger problem."

In *Kratt*, this court interpreted Justice Stevens's concurrence to mean that we should compare the maximum sentences of § 1956 or § 1957 with the statutory maximum sentence for the predicate offense in order to determine whether interpreting "proceeds" to mean "gross receipts" in the money-laundering statute results in "a radical increase of the statutory maximum." 562 F.3d at 562. For example, if the predicate offense carried a statutory maximum

penalty of five years, and the statutory maximum penalty for money laundering is twenty years, then the *Kratt* court would conclude that "proceeds" must mean "profits." *See id.* at 561–62 (describing the statutory maximum penalties in *Santos*). The *Kratt* panel never explained whether an increase in the statutory maximum sentence from five to ten years was "radical." *See id.* at 562.

I believe that the *Kratt* panel inaccurately described Justice Stevens's concurrence and announced an unwise method of statutory interpretation. First, Justice Stevens did not state that a difference between the statutory *maximum* sentences for money laundering and illegal gambling was necessary in order for "proceeds" to be defined as "profits." Rather, the sentence Santos received "was just a symptom of the unfairness of the merger that [Justice Stevens's] opinion was crafted to avoid." *Garland v. Roy*, 615 F.3d 391, 404 (5th Cir. 2010).

Second, Justice Stevens wrote that "there is no explanation for why Congress would have wanted a transaction that is a normal part of a crime it had duly considered and appropriately punished elsewhere in the Criminal Code to radically increase the *sentence* for that crime." *Santos*, 553 U.S. at 528 (Stevens, J., quoting plurality, *id.* at 517). The *Kratt* court interpreted this to mean the statutory *maximum* sentence, 579 F.3d at 562, but that reading is completely untethered from what Stevens actually wrote. A *sentence* may "radically increase" even if the statutory maximum does not; a defendant is doubly punished for the same conduct if "proceeds" means "gross receipts" when a district judge sentences the defendant to consecutive sentences on separate counts. For example, if a defendant is convicted of mail fraud, which carries a statutory maximum penalty of twenty years, *see* 18 U.S.C. § 1341, and money laundering for which the statutory maximum sentence is ten years, *see id.* § 1957(b), then nothing prevents a district court from imposing a thirty-year sentence for the same conduct—save perhaps an appellate court finding that the district court abused its discretion. Indeed, the (non-mandatory) Sentencing Guidelines *require* that the district court impose consecutive sentences when the punishment prescribed by the Guidelines exceeds the statutory maximum penalty allowed under "the count carrying the highest statutory maximum." U.S.S.G. § 5G1.2(d) & cmt. n.1 (2013). In that case, a sentencing judge could impose ten- and twenty-year sentences to run consecutively. That sentence would receive a presumption of reasonableness on appeal, *see Rita v. United States*,

551 U.S. 338, 351 (2007), and a sentencing judge could impose consecutive sentences even if the Guidelines did not suggest the imposition of consecutive sentences because the Guidelines are, of course, not binding, and a sentence may be for any period of time within the statutory range, *United States v. Booker*, 543 U.S. 220, 233 (2005). The consecutive sentences are possible only because the defendant has been convicted of both mail fraud and money laundering; he could not receive a thirty-year sentence for mail fraud alone. This result is just as "perverse" as an increase in the statutory maximum, and thus it is unlikely that Congress intended this result.

Third, each of our sibling circuits has read, parsed, and interpreted Justice Stevens's concurrence, and only one other circuit has considered a "radical increase in the statutory maximum sentence" to be outcome-determinative. Most of our colleagues interpret the term "proceeds" to mean "profits" when interpreting "proceeds" as "gross receipts" results in a "merger problem," i.e., punishing the defendant a second time for paying the essential expenses of his criminal enterprise. *See, e.g., Untied States v. Foley*, 783 F.3d 7, 15–16 (1st Cir. 2015) ("[W]e find no merger problem and thus no basis for limiting 'proceeds' to profits . . . ."); *United States v. Peters*, 732 F.3d 93, 100 (2d Cir. 2013) ("[T]he criminal forfeiture statute presents no merger issue. . . . Because the concerns uniting Justice Stevens's concurrence and the plurality in *Santos* do not apply in the context of criminal forfeiture, *Santos* does not control the question of how to interpret 'proceeds' . . . ."); *United States v. Richardson*, 658 F.3d 333, 340 (3d Cir. 2011) (holding that 'proceeds' means 'receipts' when "the merger problem that impelled a majority of the Supreme Court to throw out Santos'[s] conviction is not present"); *United States v. Rubashkin*, 655 F.3d 849, 865–66 (8th Cir. 2011) (holding that "proceeds" meant "gross receipts" because the underlying predicate offense—making false statements and reports to a bank—was "a distinct offense compared to money laundering" and did not result in a merger problem); *United States v. Van Alstyne*, 584 F.3d 803, 815 (9th Cir. 2009) ("*Santos* suggests . . . that the 'profits' definition of 'proceeds' should apply where the particular crime at issue depends on necessary payments . . . ."); *United States v. Lee*, 558 F.3d 638, 643 (7th Cir. 2009) (reversing a money-laundering conviction because the jury may have convicted the defendant for payment of wages, rent, and advertising expenses for massage parlors—essential expenses of the underlying prostitution business).

The Fifth Circuit takes a slightly different approach; it first determines whether "defining 'proceeds' as 'gross receipts' would result in the 'perverse result' of the 'merger problem.'" *Garland*, 615 F.3d at 402 (quoting *Santos*, 553 U.S. at 528 n.7 (Stevens, J., concurring)). If defining "proceeds" as "gross receipts" does not result in a merger problem, then the Fifth Circuit presumes that "'proceeds' should be defined as 'gross receipts,'" unless the legislative history suggests otherwise.[3] *Id.*

The Fourth, Tenth, and Eleventh Circuits have confined the holding of *Santos* to meaning that "'proceeds' means 'profits' for the purpose of the money laundering statute *only* where an illegal gambling operation is involved"—the two offenses with which Santos was charged. *United States v. Thornburgh*, 645 F.3d 1197, 1209 (10th Cir. 2011);[4] *see also United States v. Simmons*, 737 F.3d 319, 324 (4th Cir. 2013) ("[W]e interpreted *Santos* narrowly to bind lower courts only in cases where illegal gambling constituted the predicate for the defendant's money-laundering conviction."); *United States v. Demarest*, 570 F.3d 1232, 1242 (11th Cir. 2009) ("The narrow holding in *Santos*, at most, was that the gross receipts of an unlicensed gambling operation were not 'proceeds' under section 1956, but there is no evidence that the funds Demarest laundered were gross receipts of an illegal gambling operation. The evidence instead established that the laundered funds were the proceeds of an enterprise engaged in illegal drug trafficking."). Recently, however, the Fourth and Eleventh Circuits have broadened their interpretations of *Santos* to apply beyond illegal gambling where necessary to avoid a double-punishment problem. *See United States v. Esquenazi*, 752 F.3d 912, 935–36 (11th Cir. 2014) ("Conducting a criminal enterprise necessarily requires paying its essential expenses—doing so

---

[3]The Second Circuit has suggested agreement in dicta with the Fifth Circuit's approach. *See United States v. Quinones*, 635 F.3d 590, 599 (2d Cir. 2011). The Second Circuit commented that "the desire to avoid a 'merger problem' united five Justices in holding that Santos's payments did not constitute money laundering." *Id.* But the court observed that focusing on the merger problem alone "overlooks Justice Stevens's statement that 'the legislative history of § 1956 makes it clear that Congress intended the term 'proceeds' to include gross revenues from the sale of contraband and the operation of organized criminal syndicates involving such sales' and Justice Stevens's disagreement with the plurality's position that 'the rule of lenity must apply to the definition of 'proceeds' for these types of unlawful activities.'" *Id.* (quoting *Santos*, 553 U.S. at 525–26 & n.3 (Stevens, J., concurring in the judgment)). The Second Circuit thus held that "'proceeds' under 18 U.S.C. § 1956 is not limited to 'profits' at least where . . . the predicate offense involves the sale of contraband" and declined to "address the proper interpretation of 'proceeds' under *Santos* where the predicate offense does not involve the sale of contraband." *Id.* at 600 & n.5.

[4]In *Thornburgh*, the Tenth Circuit was limited to plain-error review, but concluded that the district court had not erred because the holding of *Santos* was limited, and even if there had been an error, the error was not plain. 645 F.3d at 1209.

should not also be separately punishable as money-laundering . . . ."); *Simmons*, 737 F.3d at 324 ("But, because the merger problem provided the 'driving force' behind both the plurality's and Justice Stevens's opinions, we recognized that *Santos* compelled us to construe the money-laundering statute so as to avoid punishing a defendant twice for the same offense.").

Many of our sibling circuits have acknowledged that this circuit interprets "proceeds" to "'mean[] profits only when the § 1956 predicate offense creates a merger problem that leads to a radical increase in the statutory maximum sentence and only when nothing in the legislative history suggests that Congress intended such an increase.'" *See, e.g.*, *Van Alstyne*, 584 F.3d at 814 (quoting *Kratt*, 579 F.3d at 562); *Garland*, 615 F.3d at 403 (quoting *Kratt*, 579 F.3d at 562); *United States v. Garcia-Pastrana*, 584 F.3d 351, 380 (1st Cir. 2009) (quoting *Kratt*, 579 F.3d at 562). But none have explicitly adopted this rule. Indeed, the Fifth Circuit has expressly rejected this circuit's approach because "Justice Stevens did not state that the defendant needed to suffer a harsh increase in his sentence in order for 'proceeds' to be defined as 'profits.'" *Garland*, 615 F.3d at 404.

Only the Ninth Circuit has "considered whether the inclusion of the money-laundering charge under Section 1957 led to 'a radical increase in the statutory maximum sentence' for the underlying offense" when applying *Santos*. *United States v. Bush*, 626 F.3d 527, 538 (9th Cir. 2010). However, the Ninth Circuit's cases do not clearly indicate that the statutory maximum sentences determine the outcome of the analysis. In *Bush*, after concluding that "none of the transactions from Bank Crozier to [the defendant] was 'central to carrying out the scheme's objective[s],'" a panel of the Ninth Circuit observed that the defendant "received five additional years for his money laundering—hardly a 'radical' disparity from the twenty-five-year sentence for his various frauds." 626 F.3d at 538 (citing *Kratt*, 579 F.3d at 562). Similarly, in *United States v. Phillips*, after concluding that the defendant's money-laundering and fraud convictions did not pose a merger problem and thus plain error did not exist, the Ninth Circuit noted in a footnote that the money-laundering convictions did not have a greater statutory maximum sentence than the fraud convictions. 704 F.3d 754, 766 & n.11 (9th Cir. 2012) (citing *Bush*, 626 F.3d at 538). In *United States v. Grasso*, a divided panel concluded that *Bush* and *Phillips* require "consider[ing] whether the inclusion of the money laundering charges leads to 'a radical

increase in the statutory maximum sentence for the underlying offense." 724 F.3d 1077, 1092 & n.15 (9th Cir. 2013) (quoting *Bush*, 626 F.3d at 538 (quoting *Kratt*, 570 F.3d at 562)). Judge Berzon dissented because she believed that "it is far from clear that under [Ninth-Circuit] case law, the extent of the increase in the statutory maximum sentence is a relevant consideration in determining whether the merger problem exists." *Id.* at 1100 (Berzon, J., dissenting). Judge Berzon explained that the *Van Alstyne* panel had "noted" the Sixth Circuit's approach, but had "construed the *Santos* plurality and concurrence *differently from the Sixth Circuit*, holding that there was a merger problem based on the defendant's conviction for both mail fraud and money laundering, without regard to the applicable statutory maximums—30 years for mail fraud and 20 years for money laundering." *Id.* at 1100–01 (emphasis added). Judge Berzon criticized the panel majority for following *Kratt* and *Bush* rather than the Ninth Circuit's earlier binding precedent.

I believe that the Fifth Circuit has formulated the most accurate statement of Justice Stevens's *Santos* concurrence, and that we should have adopted a similar approach to apply to money-laundering offenses that occurred prior to May 20, 2009. *See Rubashkin*, 655 F.3d at 864 n.3. Accordingly, "proceeds" should mean "profits" under 18 U.S.C. § 1956 and § 1957 when there is a "merger problem," e.g., when the government has charged the defendant with money laundering for the payment of the necessary expenses of the predicate crime. *Garland*, 615 F.3d at 402; *see also Van Alstyne*, 815 F.3d at 815 ("[T]he 'profits' definition of 'proceeds' should apply where the particular crime at issue depends on necessary payments . . . ."). If the money-laundering and predicate offenses do not cause a merger problem, then we must presume that "proceeds" means "gross receipts" unless the legislative history of the money-laundering statute shows that Congress intended that "proceeds" be defined as "profits." *Garland*, 615 F.3d at 401–02.

Under the proper application of *Santos*, we should vacate Olive's conviction for money laundering (Count 9) and remand his case for resentencing because his money-laundering conviction merges with his mail- and wire-fraud convictions. To determine whether there is a merger, we should examine "the concrete details of the particular 'scheme to defraud,'" *Van Alstyne*, 584 F.3d at 815, in order to determine whether the government has charged Olive

for merely "paying the essential expenses of operating the underlying crime."  *Simmons*, 737 F.3d at 324 (internal quotation marks omitted).

This leads to the question:  What are the "essential expenses" of a scheme to defraud?  This court and our sibling circuits have consistently held that commissions or salary payments may be "essential expenses" of a scheme to defraud.  In *United States v. Cloud*, the Fourth Circuit found held that "essential expenses" of a mortgage-fraud scheme were commissions to recruiters who referred buyers with good credit to the defendant to purchase the properties involved in the fraud scheme.  680 F.3d 396, 399, 406 (4th Cir. 2012).  In *United States v. Abdulwahab*, the Fourth Circuit held that commission payments to sales agents "played a critical role in the underlying fraud scheme" because the defendant promised payments for the referrals, which enticed the sales agents to obtain investors in the defendant's business.  715 F.3d 521, 531 (4th Cir. 2013).  And we have held that salary payments to employees of fake insurance companies constituted essential expenses of the insurance-fraud scheme.  *Crosgrove*, 637 F.3d at 655–56.

Olive's scheme to defraud relied upon highly compensating financial advisors who referred their clients to NFOA.  In the indictment, the government alleged that Olive used "highly compensated insurance agents across the country, [who] offered and sold investment contracts labeled as NFOA's 'Installment Plan Agreement.'"  R. 1 at 2 (Indictment ¶ 8) (Page ID #2).  In addition, evidence at trial established that financial advisors recommended NFOA's Installment Plan Agreement to their clients, and Olive paid handsome commissions to those financial advisors who referred their clients to NFOA.  Olive paid financial advisors approximately 9% of the total funds he received from the funds received from financial advisors' clients.  R. 135 at 190 (Tr. Trial Vol. 5) (Page ID #2167).  These commissions were paid "for bringing the business to NFOA."  *Id.* at 235 (Page ID #2212).  Indeed, Olive created a promotional video to show financial advisors, advertising that "[e]xchang[ing] a client's indexed annuity for a new annuity at the accumulated value" had two benefits:  "Your client receives a tax deduction and you earn 9%."  R. 131 at 104–05 (Tr. Trial Vol. 1) (Page ID #1128–29).  Thus, NFOA depended upon these financial advisors to bring NFOA clients, the commission payments to the advisors were part of the scheme to defraud, and those commissions were "essential

expenses" of the scheme. Because this is a classic example of "the merger problem," the fraud and money-laundering convictions should merge, and there is no need to consult the legislative history of these statutes. *See Garland*, 615 F.3d at 402, 404.

The majority and I therefore agree that Olive's money-laundering and fraud convictions present a merger problem. I would also conclude that the double charging was plain error because the government quite clearly indicted Olive in the money-laundering count for the payment of essential expenses of his fraud scheme and never presented evidence that Olive paid Heuermann commission with the profits of his fraud scheme. In addition, I believe that the double charging affected Olive's substantial rights because Olive was exposed to the possibility of an additional ten-year prison term as a result of the money-laundering conviction, and the district court actually used the money-laundering conviction to add sixty months to Olive's sentence. *See Crosgrove*, 637 F.3d at 657. Nevertheless, I am bound by *Kratt* and its progeny until the Supreme Court or this court sitting en banc overrules it. 6th Cir. R. 32.1(b). In sum, because there is not a "radical increase in the statutory maximum sentence" when we compare the statutory maximum sentences for money laundering and mail or wire fraud, under this Circuit's present law I must concur in the judgment.